RICHARD O'BRIEN, Plaintiff-Appellant, v. MICHAEL ROGERS, Defendant-Appellee.

Fifth District   No. 5—89—0317

Opinion filed May 8, 1990.

William L. Broom III and Craig R. Reeves, both of Barrett, Twomey, Morris, Broom & Hughes, of Carbondale, for appellant.

Charles E. Schmidt and Rebecca J. O'Neill, both of Mitchell, Brandon & Schmidt, of Carbondale, for appellee.

JUSTICE HARRISON delivered the opinion of the court:

Plaintiff, Richard O'Brien, brought an action in the circuit court of Saline County to recover damages for personal injuries he sustained while helping defendant, Michael Rogers, rebuild the roof on defendant's garage. Plaintiff's complaint contained two counts. Count I sought to impose liability on defendant under the Structural Work Act (Ill. Rev. Stat. 1987, ch. 48, par. 60 *et seq.*). Count II alleged common-law negligence. Following discovery, defendant moved for summary judgment pursuant to section 2—1005 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—1005) as to both counts. Defendant's motion was granted, and plaintiff now appeals. For the reasons which follow, we reverse and remand for further proceedings.

The standards governing an award of summary judgment are well established. The purpose of summary judgment is not to try an issue of fact, but to determine whether a triable issue of fact exists. Although summary judgment is recognized as a salutary procedure in the administration of justice, it should be granted with caution so that the right to trial of conflicting facts and inferences is not usurped. Only when the pleadings, depositions and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law should summary judgment be awarded. *Haberer v. Village of Sauget* (1987), 158 Ill. App. 3d 313, 316-17, 511 N.E.2d 805, 807.

Because of the extreme nature of summary judgment, a court must exercise extraordinary diligence in its review of the record so as not to preempt a party's right to trial by jury or its right to fully present the factual basis for its claim. (*Wysocki v. Bedrosian* (1984), 124 Ill. App. 3d 158, 164, 463 N.E.2d 1339, 1344.) The court must construe the pleadings, depositions and affidavits most strictly against the moving party and most liberally in favor of the opponent. (124 Ill.

App. 3d at 164, 463 N.E.2d at 1344.) If any material facts upon which reasonable persons may disagree are identified, or if inferences which may be drawn from those facts lead to different conclusions, the court must deny the motion and direct that resolution of those facts and inferences be made at trial. *Certified Mechanical Contractors, Inc. v. Wight & Co.* (1987), 162 Ill. App. 3d 391, 400, 515 N.E.2d 1047, 1053.

The record before us in this case includes the depositions of plaintiff, plaintiff's wife, plaintiff's mother-in-law, defendant, and one of defendant's friends, Mike May. Also included is a brief affidavit submitted by defendant. Those materials show that the accident which gave rise to this litigation took place in June of 1986. At that time, defendant was rebuilding the roof on his garage. Defendant was a self-employed general contractor and was handling the work himself. To assist him on the project, defendant enlisted the help of Mike May and plaintiff. May had never done carpentry work for a living, but was a friend of defendant's and had helped defendant do work on his house before. Plaintiff himself was a general contractor and was in the contracting business with defendant.

The record shows that defendant had previously helped plaintiff put a new shingle roof on plaintiff's house, and there was evidence to suggest that plaintiff was helping defendant rebuild his roof in order to reciprocate. This point was disputed, however. In his affidavit, defendant acknowledged that he had helped work on plaintiff's roof, but he stated that "[he] did not expect [plaintiff] to pay [him], compensate [him] in any way, or help on any future projects [he] might have." Defendant further indicated that at the time of plaintiff's accident, "[he] did not have any specific agreements with [plaintiff] to 'barter' or exchange services." Plaintiff, on the other hand, testified at his deposition that there was a barter agreement between the two men under which they agreed to trade their labor with one another. The existence of such an agreement to exchange labor was corroborated by plaintiff's wife, and was not actually denied by defendant during his deposition. At that deposition, defendant testified that "[a]t the time I did his roof, I had no idea that we was [*sic*] going to be doing mine. It wasn't arranged ahead of time that way." Nevertheless, when asked whether the arrangement had not, in fact, "worked out to be a trade type relationship," defendant answered in the affirmative.

Defendant had completely removed the old garage roof "all the way down to the ceiling joists." The joists were spaced at irregular intervals and were not covered by any sheathing material. The first step in defendant's plan for rebuilding the roof called for the laying of

a sheathing material called Aspenite across the exposed joists. According to defendant, the Aspenite sheathing was to be laid "so we would have a place to stand while we put up the rafters." On the day of the accident, the sheets of Aspenite had already been purchased and were stacked in a pile inside the garage. Mike May came over to defendant's house, and at about one o'clock in the afternoon, the two began work.

The installation of the Aspenite proceeded as follows. May would lift the sheets up to defendant, who would then nail them in place on top of the ceiling joists. Once the first few sheets were thus secured, a number of additional sheets were brought up and laid out across the ceiling joists by defendant. Defendant was in the process of nailing down these additional sheets when plaintiff arrived at the jobsite to begin work at approximately three o'clock.

Upon his arrival, plaintiff climbed a ladder to join defendant on the Aspenite platform which was being erected on top of the joists. Defendant testified at his deposition that he was aware that it was not safe to walk across the sheets which had not yet been secured to the joists. He stated that he would not have walked on those sheets himself, because the irregular spacing of the joists meant that too much of the sheets would be "hanging unsupported." Nevertheless, he admitted that he did not tell plaintiff that some of the sheets of Aspenite had not yet been nailed down, nor did he give plaintiff any warnings.

Mike May testified at his deposition that plaintiff was aware that not all of the boards were nailed down, because nailing down boards was the very thing plaintiff had climbed up the ladder to do. Defendant's deposition testimony was not so clear on this point. In any case, there is no real dispute as to what happened next. As he was standing on the platform of Aspenite sheets, plaintiff stepped on a sheet which had not yet been nailed down. The sheet gave way, and plaintiff fell to the floor below, sustaining serious and permanent injuries.

Following this accident, plaintiff brought an action in the circuit court of Saline County to recover damages from defendant for the injuries he sustained. As we noted at the outset of this opinion, plaintiff's complaint was in two counts. Count I sought to impose liability on defendant pursuant to the Structural Work Act (Ill. Rev. Stat. 1987, ch. 48, par. 60 *et seq.*). Count II alleged common-law negligence. Following discovery, defendant filed a motion for summary judgment as to both counts. Plaintiff opposed that motion and filed his own motion to strike an affidavit which had been submitted by defendant in support of his summary judgment motion. On April 19, 1989, the cir-

cuit court entered an order granting defendant's motion for summary judgment and denying plaintiff's motion to strike. From this order, plaintiff now appeals.

On this appeal, plaintiff first argues that the circuit court erred in entering summary judgment against him on the Structural Work Act (Act) (Ill. Rev. Stat. 1987, ch. 48, par. 60 *et seq.*) claim asserted in count I of his complaint. We agree. The Structural Work Act provides, in part:

> "All scaffolds, hoists, cranes, stays, ladders, supports, or other mechanical contrivances, erected or constructed by any person, firm or corporation in this State for the use in the erection, repairing, alteration, removal or painting of any house, building, bridge, viaduct, or other structure, shall be erected and constructed, in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon, or passing under or by the same, and in such manner as to prevent the falling of any material that may be used or deposited thereon." Ill. Rev. Stat. 1987, ch. 48, par. 60.

Defendant asserts that the Act cannot be invoked by plaintiff here because when plaintiff helped rebuild defendant's roof, he did so voluntarily and without pay. As we have previously indicated, however, the record before us contains evidence from which reasonable persons could conclude that plaintiff was actually working on defendant's roof pursuant to a barter agreement between the parties for an exchange of their labor. If this were, in fact, the case, we do not believe that plaintiff could be characterized as an uncompensated volunteer.

Even if we were to assume for the sake of argument that plaintiff was working for free, defendant's argument would still fail. Nothing in the language of the Structural Work Act limits the statute's coverage to individuals who are being paid for their labor. The Act requires that scaffolding and other support devices must be so erected and constructed, placed and operated so as to give proper and adequate protection not only to persons "employed" thereon, but also to persons "engaged" thereon. (Ill. Rev. Stat. 1987, ch. 48, par. 60.) The word "engaged" has been defined as meaning "to be busied," "to carry on," "to devote attention and effort," "to embark on," or "to take part in." (30 C.J.S. *Engage* at 698 (1965).) None of these definitions implies payment for services.

We recognize, of course, that the word "engaged" has sometimes

also been defined to mean "employed" (30 C.J.S. *Engage* at 698 (1965)), and that "employment" normally suggests the payment of compensation. We do not believe that such interpretation was intended by the legislature here, however. To hold otherwise would render the term "engaged" completely superfluous. This would violate one of the basic rules of statutory construction, namely, that statutes should, if possible, be construed so that no term is rendered meaningless or superfluous. *Niven v. Siqueira* (1985), 109 Ill. 2d 357, 365, 487 N.E.2d 937, 942.

■ That the Structural Work Act is not limited to persons who are paid for their work is evident when one considers the purpose for which the statute was enacted. Our supreme court has recently noted that the legislature enacted the Structural Work Act in order to provide protection to workers engaged in activities of a particularly hazardous nature. (*Meyer v. Caterpillar Tractor Co.* (1990), 135 Ill. 2d 1, 7-8.) This suggests that the critical inquiry under the Act is the type of activity in which an individual is involved, not whether he receives compensation for that involvement.

■ Consistent with this view, a cause of action has been recognized under the Structural Work Act where an individual has been injured while engaged in an activity covered by the Act even though that individual was not employed or paid by the person upon whom he sought to impose liability. (See *Carlton v. Verplaetse* (1983), 120 Ill. App. 3d 795, 458 N.E.2d 584.) In order for a plaintiff to recover in an action brought under the Structural Work Act, he must establish only that:

" '(1) [he was] involved in a construction activity covered by the Act; (2) the activity was being performed with reference to a structure covered by the Act; (3) a scaffold or other mechanical device as defined by the Act was being used in the activity; (4) the scaffold or device was unsafe, or not safely placed or operated; (5) the unsafe condition proximately caused plaintiff's injury; (6) the defendant had charge of the work, as that phrase has been interpreted under the Act; and (7) the defendant willfully violated the Act.' " (*Tracy v. Montgomery Ward & Co.* (1990), 193 Ill. App. 3d 304, 307-08, 549 N.E.2d 984,987, quoting *Smith v. Central Illinois Public Service Co.* (1988), 176 Ill. App. 3d 482, 488, 531 N.E.2d 51, 55.)

Whether plaintiff here was paid or not therefore has no bearing on the viability of his claim against defendant.

■ ■ As an alternative basis for upholding the circuit court's judgment, defendant argues that there was no evidence that he had

committed a willful violation of the safety standards required by the Structural Work Act. A willful violation of the Act is committed when one having charge of the work knows that a dangerous condition exists on the support device or, by exercise of reasonable care, could have discovered the existence of the condition. (*Brazier v. Kontos* (1987), 160 Ill. App. 3d 177, 182, 513 N.E.2d 152, 156.) The question of willfulness is primarily a factual one for the jury to decide. (160 Ill. App. 3d at 182, 513 N.E.2d at 156.) In this case, the evidence showed: (1) that defendant was fully aware that not all of the Aspenite sheets had been nailed down when plaintiff climbed up the ladder to begin work on the roof, and (2) that defendant realized that unsecured sheets were not safe to walk on. This evidence certainly raises a jury question on the issue of willfulness. Summary judgment therefore could not be justified on the grounds that defendant had not acted willfully.

■ In granting summary judgment for defendant, the circuit court did not, in fact, rely on the proposition that defendant had not acted willfully, nor did it base its decision on the fact that plaintiff was an unpaid volunteer. Rather, the court apparently believed that plaintiff could not recover under the Structural Work Act because the Aspenite platform from which he fell did not constitute a "scaffold" within the meaning of the Act. We cannot agree with this analysis. The courts of this State have recognized that where a floor is used simply as a floor, it is not a scaffold or other similar mechanical device within the meaning of the Act. (See *Vuletich v. United States Steel Corp.* (1987), 117 Ill. 2d 417, 423, 512 N.E.2d 1223, 1225.) As our review of the record has shown, however, such was not the case here. According to defendant himself, the Aspenite sheeting from which plaintiff fell was being erected for the express purpose of providing a platform so that the parties would have a place to stand while they put up the rafters on the garage. Where, as here, a worker relies on a partially completed floor for support as a working platform, he may recover under the Act. See 117 Ill. 2d at 423, 512 N.E.2d at 1225.

■ Defendant's final argument in support of the circuit court's entry of summary judgment on plaintiff's Structural Work Act claim is that because the Aspenite platform from which plaintiff fell was not yet completed at the time of plaintiff's accident, that platform did not yet fall within the protections of the Act. This argument is wholly without merit. By its terms, the Act provides that scaffolds "shall be *erected* and *constructed,* in a safe, suitable and proper manner, and shall be so *erected* and *constructed,* placed and operated as to give

proper and adequate protection to the life and limb of any person or persons employed or engaged thereon." (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 48, par. 60.) Under any reasonable interpretation, we believe that this language must be understood to mean that the coverage of the Act is not limited to an individual who is injured while employed or engaged on a scaffold which is already completed, in place, and in operation, but that it also extends to individuals injured while employed or engaged on a scaffold which is still in the process of being put into place, as was the case here.

Such an interpretation is fully consistent with this court's holding in *Miller v. Clark Wood Construction Co.* (1987), 151 Ill. App. 3d 723, 502 N.E.2d 1061. There, we found that the Act applied even to a worker who was injured when a device covered by the Act, a crane, was being dismantled following the completion of the construction work for which it had been utilized. If a device is subject to the Act while being taken apart after the structural activity for which it was used has ended, it must surely be the case that the Act will apply with equal force to a scaffold or other covered device where, as here, the scaffold or device is in the process of being built so that the structural activity involved may first begin.

In sum, none of the arguments advanced by defendant can support the circuit court's ruling on plaintiff's Structural Work Act claim, and we have found no other basis upon which that ruling can be sustained. The circuit court's entry of summary judgment in favor of defendant and against plaintiff on count I of plaintiff's complaint must therefore be reversed. We turn then to the propriety of the circuit court's entry of summary judgment in favor of defendant on count II of plaintiff's complaint for common-law negligence.

In a cause of action alleging negligence, a plaintiff must establish the existence of a duty, a breach of that duty, and an injury proximately resulting from the breach. (*Romano v. Bittner* (1987), 157 Ill. App. 3d 15, 22, 510 N.E.2d 924, 929.) We believe that plaintiff here could bring a negligence action against defendant based on the breach of defendant's duty as a possessor of land to plaintiff, who was an invitee on his premises. The duty owed by possessors of land as to conditions on their land is set forth in section 343 of the Restatement (Second) of Torts (1965), which has been incorporated into the common law of Illinois. (*Courtney v. Allied Filter Engineering, Inc.* (1989), 181 Ill. App. 3d 222, 226, 536 N.E.2d 952, 956.) That section provides:

> "A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger." Restatement (Second) of Torts §343 (1965).

An "invitee" has been defined as a person who enters the premises pursuant to an express or implied invitation to transact business in which he and the owner have a mutual interest, or to promote some real or fancied material, financial or economic interest of the owner. (*Skoczylas v. Ballis* (1989), 191 Ill. App. 3d 1, 4, 547 N.E.2d 565, 566-67.) The record which has thus far been adduced indicates that plaintiff here fell within this definition at the time of his accident. Although the Premises Liability Act has abolished the distinction between invitees and licensees with respect to the duty owed by a landowner (Ill. Rev. Stat. 1987, ch. 80, par. 302), the act did not significantly alter the duty owed to an invitee. (*Ward v. K mart Corp.* (1990), 136 Ill. 2d 132, 142-43.) Because plaintiff was an invitee, defendant owed him a general duty to use reasonable and ordinary care in keeping the property reasonably safe. *Courtney v. Allied Filter Engineering, Inc.* (1989), 181 Ill. App. 3d 222, 226, 536 N.E.2d 952, 956.

In this case, defendant does not deny that the loose sheets of Aspenite on the garage ceiling presented an unreasonable risk of harm to plaintiff. Defendant was, of course, fully aware that these sheets were unsecured. He also fully realized the risk of harm which the unsecured sheets presented, as demonstrated by the testimony he gave at his deposition that he would not, himself, have walked across the unsecured boards because of the potential that they might give way.

Defendant nevertheless contends that he cannot be held liable to plaintiff because at the time plaintiff was injured, defendant was in the process of securing the Aspenite sheets to the joists. According to defendant's counsel, "Defendant cannot be faulted for failing to nail [the sheet] before Plaintiff came to the work area, since Defendant was already in the process of nailing the boards and merely had not yet reached the one which the Plaintiff was proceeding to nail." What defendant really appears to be suggesting here is that he was doing everything he could to secure the sheets of Aspenite and therefore could not be said to have failed to exercise reasonable care to protect plaintiff against the danger posed by the unsecure sheets. We do not believe that the matter is so clear cut. From

the record before us, it appears that this accident might have been avoided had defendant simply warned plaintiff to be careful as he walked across the unsecured sheets. By defendant's own admission, no such warning was given. Accordingly, a jury might have concluded that defendant did in fact fail to exercise reasonable care to protect plaintiff.

Defendant seeks to avoid this conclusion by arguing that plaintiff was fully aware that some of the Aspenite sheets had not yet been secured, since, according to May, at least, nailing down the sheets was the very thing which plaintiff had climbed up to the ceiling to do. Defendant seems to be suggesting that this is therefore not a situation in which he should have expected that plaintiff would not have discovered or realized the danger or would have failed to protect himself against it. The problem with this argument is that the hazard posed by the Aspenite sheeting did not arise simply from the fact that some of the sheets were not nailed down. Defendant's own deposition testimony indicates that the real danger arose from the fact that the unsecured boards were laid across joists which were placed at irregular intervals. The irregular spacing of the ceiling joists meant that too much of the end of the Aspenite sheeting was unsupported so that if one stepped on the unsupported edge, the sheet would flip over and one would fall through the joists. That is apparently exactly what happened to plaintiff here. Under these circumstances, we can scarcely agree with the circuit court's conclusion that there was no genuine issue of material fact and that defendant was not guilty of negligence as a matter of law. The circuit court's entry of summary judgment against plaintiff on count II of his complaint must therefore also be reversed.

For the foregoing reasons, the judgment of the circuit court of Saline County granting summary judgments in favor of defendant and against plaintiff on counts I and II of plaintiff's complaint is reversed, and this cause is remanded for further proceedings consistent with this opinion. In light of this disposition, we need not reach plaintiff's additional arguments that the circuit court erred in failing to strike defendant's affidavit and in not allowing plaintiff to file a counteraffidavit before ruling on defendant's motion for summary judgment.

Reversed and remanded.

WELCH and GOLDENHERSH, JJ., concur.