SULLIVAN'S WHOLESALE DRUG COMPANY, INC., Plaintiff-Appellant, v. FARYL'S PHARMACY, INC., *et al.*, Defendants-Appellees.

Fifth District   No. 5—90—0344

Opinion filed June 4, 1991.—Rehearing denied July 8, 1991.

Carl E. Kasten and Nancy L. Ruyle, both of Phelps, Carmody, Kasten, Verticchio & Ruyle, of Carlinville, for appellant.

Jason M. Rugo, of Gallop, Johnson & Neuman, of St. Louis, Missouri, for appellees Health Group Care Centers, Inc., and Miller Rutledge Corporation.

Frederic L. Kenney and Glen A. Featherstun, both of Armstrong, Winters, Prince, Featherstun & Johnson, of Decatur, for appellee Enloe Drugs, Inc.

No brief filed for appellee Faryl's Pharmacy, Inc.

JUSTICE HARRISON delivered the opinion of the court:

Sullivan's Wholesale Drug Company, Inc. (Sullivan's), filed a five-count complaint in the circuit court of Montgomery County against Faryl's Pharmacy, Inc. (Faryl's); Enloe Drugs, Inc. (Enloe); Health Group Care Centers, Inc. (Health Group Care); and Miller Rutledge Corporation to challenge what it alleged was an illegal kickback scheme involving the sale of drugs to nursing home residents. Count II of Sullivan's complaint, as amended, was dismissed, and only counts I, III, IV, and V are now before us on appeal. Count I was directed against Faryl's and Enloe and alleged tortuous interference with business relations. Count III was directed against all of the defendants and alleged violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (Ill. Rev. Stat. 1983, ch. 121½, par. 261 *et seq.*). Counts IV and V were likewise directed against all defendants, but they advanced no additional theories of recovery. They merely reiterated the substantive allegations contained in counts I and III. The only significant difference was that count IV added a prayer for punitive damages, while count V asked for injunctive relief. Following extensive discovery, the circuit court entered summary judgment in favor of defendants and against Sullivan's as to all these counts. Sullivan's now appeals. We affirm in part, reverse in part, and remand.

▮ The standards governing an award of summary judgment are well established. The purpose of summary judgment is not to try an issue of fact, but to determine whether a triable issue of fact exists. Although summary judgment is recognized as a salutary procedure in the administration of justice, it should be granted with caution so that the right to trial of conflicting facts and inferences is not usurped. Only when the pleadings, depositions and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as

a matter of law should summary judgment be awarded. *O'Brien v. Rogers* (1990), 198 Ill. App. 3d 341, 344, 555 N.E.2d 1005, 1007.

Because of the extreme nature of summary judgment, a court must exercise extraordinary diligence in its review of the record so as not to preempt a party's right to fully present the factual basis for its claim. The court must construe the pleadings, depositions and affidavits most strictly against the moving party and most liberally in favor of the opponent. If any material facts upon which reasonable persons may disagree are identified, or if inferences which may be drawn from those facts lead to different conclusions, the court must deny the motion and direct that resolution of those facts and inferences be made at trial. 198 Ill. App. 3d at 345, 555 N.E.2d at 1007.

The record in this case is voluminous, but the basic facts and allegations are relatively straightforward. Maurice Sullivan is a registered pharmacist who operated a retail pharmacy business in Hillsboro, Illinois. In 1978, Sullivan began providing pharmacy service to the residents of a nursing home known as Hillsboro Hawthorne Lodge (the nursing home). A large number of the nursing home's residents had been customers of Sullivan before they entered the facility, they remained his customers after entering the home, and he continued to service them through numerous changes in the nursing home's ownership.

Ownership of the home was eventually transferred to Miller Rutledge Corporation, which was, in turn, acquired by Health Group Care in 1982. At that time, Sullivan provided pharmacy services to the nursing home through his company, Sullivan's Wholesale Drug Company, Inc. (Sullivan's), the nominal plaintiff in this litigation. Services were provided pursuant to an agreement terminable by either party on 30 days' notice. Under the agreement Sullivan's billed patients of the home individually, just as if they were customers of its retail pharmacy, and it assumed full responsibility for collecting amounts due.

In the spring of 1983, Health Group Care advised Sullivan's that it intended to amend the agreement's terms. A new contract was presented to Sullivan's by Wilma McCammack, the nursing home administrator. It provided that Sullivan's would retain responsibility for billing Medicaid patients, but that Medicare and private patients, *i.e.*, those whose care was paid for by private insurance or by the patients themselves, would now be billed directly by the nursing home. The nursing home would then forward payment to Sullivan's. However, Sullivan's was not entitled to the full amount of the patient billings. Rather, the contract authorized the nursing home to deduct 15% of the total amount billed and to keep that amount for itself.

Sullivan's believed that this proposed 15% deduction was, in effect, a kickback which the nursing home sought to exact in exchange for granting the pharmacy exclusive access to the business generated by the home's Medicaid patients. It protested that such kickbacks were illegal, unethical, and immoral, and refused to sign. Sullivan's was then contacted by Joyce Finkenstein, Health Group Care's regional supervisor, who told Sullivan's that if it would not agree to the new terms, it would not have the business and that Health Group Care would find a different pharmacy provider.

Sullivan's explained to Finkenstein why it felt as it did, but was told simply, "Well, we have to generate money from any way we can [sic]." When Sullivan's continued to adhere to its position, Finkenstein directed McCammack to notify Maurice Sullivan that the nursing home intended to terminate him as its consultant pharmacist and that it would no longer use his company as its primary pharmaceutical provider. By letter dated April 25, 1983, McCammack so notified Sullivan of his termination, effective in 30 days.

Sullivan's ceased servicing the nursing home on or about June 1, 1983, and was replaced by defendant Faryl's. With this change, the residents of the nursing home were no longer able to buy their drugs through Sullivan's. They were required to use Faryl's. Although there is considerable uncertainty as to whether Faryl's actually signed the proposed contract which had been rejected by Sullivan's, there is no dispute that Faryl's agreed to and abided by the 15% kickback scheme to which Sullivan's had objected.

In the circuit court, defendants attempted to justify the 15% deduction on the grounds that it was common practice and represented reasonable compensation for services provided, costs incurred, and risks assumed by the nursing home under the pharmacy provider agreement. The agreement itself stated that the 15% was compensation for "the expense incurred for labor, materials, and management time" by the nursing home. Evidence adduced by defendants, however, indicated that the 15% was also intended (1) to help offset the risk of bad debt and billing services, which were now assumed by the nursing home and not the individual pharmacy, and (2) to compensate the nursing home for various services it provided to the pharmacists, including ordering, storing, and accounting for drugs.

Sullivan's, for its part, asserted that these claimed services were in fact illusory. According to the evidence which it adduced, the 15% charge bore no relation to the actual cost of services and risks which the nursing home assumed. Responsibility for preparing statements of charges to individual patients remained with the pharmacists. The

nursing home simply incorporated the pharmacy's statement into its billing to the nursing home residents. The only real savings to the pharmacy was that it no longer had to prepare and pay to have the individual bills mailed, and even that burden was evidently inconsequential. As for the risk of bad debt, deposition testimony was presented from various pharmacists in central Illinois which showed that the payment rate among private-paying nursing home residents was extremely high and that the risk of nonpayment was very low. There was even testimony that the new system was actually detrimental to the pharmacy provider because (1) it now took the pharmacy longer to receive payment from the nursing home than it would have if the individual patients had been billed directly, and (2) given the real possibility that the nursing home might fail financially, the pharmacy provider now risked never receiving any payment at all.

The evidence established that when the new system went into effect, the pharmacy charges to the nursing home's residents increased. When complaints were made regarding the change and the attendant price increases, the nursing home's administrator issued a letter in which she represented that the change had been made "[d]ue to circumstances beyond our control." The letter further indicated that the increase in the pharmacy bills was attributable to the fact that "we had to order from both pharmacies to get started on the new system," and that the increases would only be temporary.

The nursing home never did inform its residents of the terms of the new contract or of the 15% cut it was now taking from their pharmacy bills. Under the new system, the home simply continued to send residents itemized pharmaceutical bills like the ones issued when the residents had been billed directly by the pharmacist under the old system. Each patient would receive such a statement (they were now called "Patient Profile Reports"), and the statement would give the name of the pharmacy, the prescription number, the drug prescribed, the name of the prescribing doctor, the date of the prescription, the quantity of medication involved, the price of that medication, and the initials of the pharmacist by whom the prescription was filled. If there were multiple prescriptions, this data would be given separately for each one, and the total pharmacy charge for all prescriptions would be indicated at the bottom of the page.

The only real change for the residents under the new system was that they did not pay the pharmacy charges separately. Rather, the total charge as indicated on the Patient Profile Report was carried over to the basic nursing home bill and listed there under the category "drugs," along with the other charges for nursing care, laundry, and

the like. This permitted the residents to pay all the charges related to their care at one time with one check. The convenience of such a system is beyond dispute. Also beyond dispute, however, is that it gave residents the impression that they were being billed by the nursing home for exactly what the pharmacist was charging for the medication. That this was not so, that residents were actually being charged 15% more than the drugs cost, did not come to light until the wife of one of the residents complained directly to Faryl's and was told that the price increases were attributable to the 15% cut the nursing home now demanded.

After several months, the nursing home replaced Faryl's with Enloe, supposedly because of the excessive charges imposed by Faryl's on the nursing home residents. Health Group Care had actually been in contact with Enloe even before Sullivan's was terminated, and Maurice Sullivan testified in his deposition that McCammack had told him that if he would not sign and the nursing home could not get another local pharmacy to sign, they would use Enloe.

Enloe ultimately operated at the nursing home on the same terms which had been offered to, but rejected by, Sullivan's. For Enloe, the 15% kickback scheme was not novel. At the time it took over from Faryl's, Enloe was already providing pharmacy services under similar terms to another nursing home operated by defendant Health Group Care in Pana. Testimony also showed that at other nursing homes owned by different parties, Enloe permitted the homes to retain up to 25% of the gross pharmacy billings.

■ As indicated at the outset of this opinion, count I of Sullivan's amended complaint sought to impose liability on Faryl's and Enloe based on tortuous interference with business relationships. To establish a cause of action for tortuous interference with a business relationship, a plaintiff must plead and prove the existence of a valid business relationship or expectancy, the defendant's knowledge of that relationship or expectancy, intentional interference by the defendant which induced or caused the breach or termination of the relationship or expectancy, and resulting damage. *Alfieri v. CSX Corp.* (1990), 201 Ill. App. 3d 559, 569, 559 N.E.2d 166, 173.

■ In the record before us there is no evidence that Faryl's or Enloe induced or caused either the residents of the nursing home or the nursing home itself to sever the business relationships which they had with Sullivan's. Although there was certainly communication between Health Group Care and Faryl's and Enloe prior to the termination of plaintiff's services, there is no genuine issue that those communications were initiated by Health Group Care, not Faryl's or

Enloe. There is absolutely no indication that Faryl's or Enloe actively solicited Sullivan's business. They merely agreed to take over that business after Sullivan's was terminated. Plaintiff has not cited and we have not found any authority which suggests that such an agreement, standing alone, is sufficient to constitute actionable inducement. Summary judgment in favor of Faryl's and Enloe and against Sullivan's was therefore proper on count I of Sullivan's amended complaint. The circuit court was likewise correct in granting summary judgment in favor of Faryl's and Enloe on counts IV and V to the extent that those counts sought relief on a tortuous interference theory.

We turn then to count III, which alleged that all defendants had violated the Consumer Fraud Act (Ill. Rev. Stat. 1983, ch. 121½, par. 261 *et seq.*). Section 2 of the Act (Ill. Rev. Stat. 1983, ch. 121½, par. 262) provides:

> "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act' *** in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby."

In construing the terms of this statute, consideration is to be given to the interpretations of the Federal Trade Commission and the Federal courts relating to section 5(a) of the Federal Trade Commission Act (FTCA) (15 U.S.C. §45(a) (1973)). (Ill. Rev. Stat. 1983, ch. 121½, par. 262.) The Federal courts have held that section 5(a) of the FTCA prohibits conduct which violates section 2(c) of the Clayton Act (*Laughlin v. Evanston Hospital* (1990), 133 Ill. 2d 374, 389, 550 N.E.2d 986, 992), as well as "unfair" conduct which is neither in violation of the Federal antitrust laws nor deceptive (see, *e.g., Spiegel, Inc. v. Federal Trade Comm'n* (7th Cir. 1976), 540 F.2d 287). The Federal courts have further held that in determining whether a practice that is neither deceptive nor in violation of the Federal antitrust laws is nonetheless unfair, the factors to be considered include:

> " '(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise— whether, in other words, it is within at least the penumbra of

some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).' " *Federal Trade Comm'n v. Sperry & Hutchinson Co.* (1972), 405 U.S. 233, 244 n.5, 31 L. Ed. 2d 170, 179 n.5, 92 S. Ct. 898, 905 n.5, quoting 29 Fed. Reg. 8355 (1964).

Drawing on this expansive interpretation of the FTCA, Sullivan's argues that defendants should be held liable here not only because their conduct was deceptive, but also because it constituted an "unfair method of competition" in that it violated the provisions of section 5(a) of the Federal Trade Commission Act (15 U.S.C. §45(a) (1973)), section 10—1 of the Illinois Pharmacy Practice Act (Ill. Rev. Stat. 1983, ch. 111, par. 4032), and section 2(c) of the Clayton Act, as amended by the Robinson-Patman Act (15 U.S.C. §13(c) (1988)). This analysis cannot withstand scrutiny.

█ While the construction placed on the FTCA by the Federal courts should be considered in construing the Consumer Fraud Act, the two statutes are not coextensive. Just because conduct may run afoul of the FTCA or section 2(c) of the Clayton Act does not mean that it automatically violates the Consumer Fraud Act. To the contrary, our supreme court has now held quite explicitly that, unlike the Federal law, the reach of the Consumer Fraud Act is "limited to conduct that defrauds or deceives consumers or others." (*Laughlin v. Evanston Hospital* (1990), 133 Ill. 2d 374, 390, 550 N.E.2d 986, 993.) Thus, Sullivan's cause of action must stand or fall on whether defendants' conduct was deceptive. If it was not deceptive, whether it violated other laws or ethical standards is irrelevant.[1]

█ Defendants argue vigorously that Sullivan's has no standing to sue them under the Consumer Fraud Act (Ill. Rev. Stat. 1983, ch. 121½, par. 261 *et seq.*) because it is not a "consumer." They are wrong. The protections of the statute are not limited to consumers. That this is so is made clear by the full title of the act itself, which indicates that it is "An Act to protect consumers and borrowers and *businessmen* against fraud, unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce ***." (Emphasis added.) (Ill. Rev. Stat. 1983, ch. 121½,

---

[1]Because conduct which is merely unethical is not actionable under the Consumer Fraud Act, the circuit court here also properly refused to consider the expert testimony adduced by Sullivan's that defendants' conduct did not comport with the professional standards governing pharmacy providers.

par. 261 *et seq.*) Moreover, section 10a of the Act (Ill. Rev. Stat. 1983, ch.121½, par. 270a) provides that "[a]*ny person* who suffers damage as a result of a violation of *** this Act committed by any other person may bring an action against such person." (Emphasis added.) The Act expressly defines the term "person" to include any corporation, company or business entity. Ill. Rev. Stat. 1983, ch. 121½, par. 261(c).

To accept defendants' position would require us to ignore the clear and unambiguous language of the statute. It would also require us to ignore the admonition in section 11a of the statute (Ill. Rev. Stat. 1983, ch. 121½, par. 271a) that the Act "shall be liberally construed to effect the purposes thereof." Thus, while some authorities may be construed as holding otherwise, we believe that the only possible conclusion is that aggrieved businessmen do have standing to bring suit under the Act. See *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.* (1989), 190 Ill. App. 3d 524, 531-34, 546 N.E.2d 33, 39-41.

■ Defendants Health Group Care and Miller Rutledge contend that they cannot be liable to Sullivan's because their arrangement with the company was terminable at will and, as a matter of law, a "*party* to an at-will contract does not incur *tort* liability to the other party, under any theory, when it terminates the contract according to its terms." (Emphasis in original.) The problem with defendants' argument is that count III does not purport to advance a common law tort claim. This is a statutory action under the Consumer Fraud Act (Ill. Rev. Stat. 1983, ch. 121½, par. 261 *et seq.*). In order to establish a violation of the Consumer Fraud Act, a party must show a deceptive act or practice, intent by the defendant that others rely on that deception, and that the deceptive act or practice occurred in the course of conduct involving trade or commerce. (Ill. Rev. Stat. 1983, ch. 121½, par. 262; *Lane v. Fabert* (1989), 178 Ill. App. 3d 698, 705, 533 N.E.2d 546, 551.) Common law notions of at-will contracts do not enter into this formula. Accordingly, the fact that one party may terminate his business relationship with another at will does not give that party license to engage in deceptive practices which are unlawful under the statute.

■ Defendants next argue that they cannot be held liable because they engaged in no deceptive practice. The record showed, however, that all of the defendants participated in issuing bills to the residents of the nursing home which indicated that those residents were being charged a specified amount for specified drugs, when in fact the charge for pharmacy services was only 85% of what the patients were

required to pay. A trier of fact could certainly conclude that such a practice was patently deceptive.

Defendant Health Group Care attempted to establish that its 15% fee was justifiable for services rendered, but we are aware of no authority for a "services rendered" exception for conduct which is otherwise deceptive. Moreover, as our discussion of the evidence has indicated, substantial testimony was adduced which indicated that the 15% charge bore no real relationship to the actual value of the services provided by the nursing home, which were *de minimis*. At the very least, there was a genuine issue of fact as to this point.

■ Defendants further argue that their billing practices were not deceptive because a copy of the contract disclosing the 15% kickback scheme had been submitted to regulatory authorities and therefore could have been reviewed by any resident of the home who was interested in its contents. We find this argument singularly unpersuasive.

Defendants base their argument on *Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.* (1986), 114 Ill. 2d 278, 499 N.E.2d 1319, where an insurance company was charged with selling policies with limits higher than potential liability under State law. In that case, the supreme court found that there was no deceptive practice because the legal limits were defined by statute, and the statute was a matter of public record available to whomever was interested. That result is not surprising considering that all persons are presumed to know the law. (114 Ill. 2d at 292, 499 N.E.2d at 1325.) Here, however, the same presumption does not apply, for we are not dealing with a matter which is specified by statute, and it is by no means clear that the agreement in dispute was, in fact, readily available for review.

Defendants cite numerous Federal regulations governing nursing homes which receive Medicare and Medicaid payments. Those regulations do require that disclosure of pharmacy provider agreements be made to State and Federal agencies, and the evidence indicated that such disclosure was made to the relevant governmental agencies. However, there is nothing before us which indicates that those agencies had any provisions for allowing residents of the nursing home or members of the public to review the copies of the pharmacy provider agreements submitted to them.

Moreover, the regulations invoked by defendants pertain solely to Medicare and Medicaid. Medicaid patients, however, were not even subject to the 15% kickback scheme. The scheme was directed in large part to private-pay patients, and we have difficulty understanding why such patients would ever have thought to check with the gov-

ernmental agencies charged with enforcing Medicare and Medicaid rules for information regarding the charges for their medication. If those patients checked with anyone, presumably it would be with their private insurers, and there is nothing before us to suggest that any private insurers were advised of the kickback agreement here.

■ We are likewise unpersuaded by defendants' claim that the agreement was not deceptive because it was on file in the nursing home office and could have been reviewed there on demand. As a preliminary matter, there is a genuine issue as to whether Faryl's ever signed the pharmacy provider agreement which contained the kickback clause. Defendants argue that this is immaterial because even if Faryl's did not actually sign the agreement, a copy of the unsigned agreement was on file at all times in the nursing home office. We fail to see, however, how an unsigned agreement could possibly have placed the residents of the nursing home on notice of anything. If the agreement was not signed, a reasonable inference would be that Faryl's had not agreed to it and that it had no effect.

Furthermore, we cannot understand under the circumstances present here when a resident of the nursing home would ever have even thought to check the nursing home's records regarding charges for pharmaceutical services. The bills themselves gave absolutely no indication that any charge was made for anything except the actual price of the drugs, and when the nursing home was questioned regarding the change in pharmacists, it gave no hint that a new charge was being imposed by the nursing home under the new system.

In any case, we do not believe the onus of discovering the changes in the agreement was on the residents. Rather, the nursing home was obliged to affirmatively disclose those changes. Indeed, the very regulations invoked by defendants expressly state that nursing home residents must be "informed in writing of all changes in services and charges before or at the time of admission and on a continuing basis." (Long Term Care Survey Forms, 53 Fed. Reg. 22868 (1988).) This was not done here. As previously noted, the residents were never informed by the nursing home that it was taking a 15% cut from their pharmacy bills. Defendants' "public record" defense must therefore fail.

■ Defendants argue that summary judgment was properly granted in their favor because there was no showing that their conduct resulted in public injury. This argument is also without merit. No allegation of public injury is required to recover money damages under the Consumer Fraud Act. (*Duncavage v. Allen* (1986), 147 Ill. App. 3d 88, 102, 497 N.E.2d 433, 441; see *Warren v. LeMay* (1986),

142 Ill. App. 3d 550, 568, 491 N.E.2d 464, 475 (single transaction sufficient); *Tague v. Molitor Motor Co.* (1985), 139 Ill. App. 3d 313, 316, 487 N.E.2d 436, 437 (action not defeated on grounds it constituted only private wrong).) This was so before and it has now been made explicit by the legislature. See Ill. Rev. Stat. 1989, ch. 121½, par. 270a(a) ("Proof of a public injury, a pattern, or an effect on consumers generally shall not be required").

In any case, evidence of public injury was presented. As our statement of the facts indicated, prices did go up, at least under Faryl's, when the 15% kickback was instituted. Moreover, expert testimony was presented by plaintiff which showed that kickback schemes of this sort have an adverse effect on competition among pharmacy service providers, with a corresponding detriment to the consuming public. This conclusion is scarcely surprising. If the evidence thus far presented is correct, the nursing home residents were clearly paying for goods and services they were not receiving. It is difficult to see how there can be any possible social utility in this.

There can be no dispute that the misrepresentation made by the defendants went to a material fact, *i.e.,* the price which the nursing home residents were being charged for their prescriptions, and we think it obvious that defendants intended for the nursing home residents to rely on their misrepresentation. Actual reliance was established. The nursing home residents paid the bills in full. In any case, actual reliance was not required. Misrepresentations are actionable even when actual reliance has not been established. *Salkeld v. V.R. Business Brokers* (1989), 192 Ill. App. 3d 663, 677, 548 N.E.2d 1151, 1160.

Defendants claim that Sullivan's failed to establish that the injuries it allegedly sustained were proximately caused by their allegedly deceptive conduct. Proximate cause, however, is a question of fact for resolution by the trier of fact (*Scott & Fetzer Co. v. Montgomery Ward & Co.* (1986), 112 Ill. 2d 378, 393, 493 N.E.2d 1022, 1028), and we do not believe that there was an adequate basis here for concluding that the requisite causal link was absent as a matter of law. Nor do we believe that the circuit could have concluded as a matter of law that the damages sought by Sullivan's were too speculative. We also do not believe, on the record before us, that there is any absolute legal impediment to the recovery by Sullivan's of punitive damages. We therefore reverse the entry of summary judgment against Sullivan's on count III of its complaint and on count IV to the extent that count IV is premised on a violation of the Consumer Fraud Act.

However, we affirm the entry of summary judgment against Sullivan's as to count V, which sought preliminary and permanent injunctive relief to bar defendants "from performing further under the arrangements and contracts" described in the complaint. The circuit court found that Health Group Care and Miller Rutledge Corporation are no longer in the nursing home business and that both Faryl's and Enloe are no longer the primary pharmacy providers under the challenged agreements. This finding has not been challenged by Sullivan's. Sullivan's request for injunctive relief is therefore moot. Under these circumstances, we need not reach defendants' contention that, as a matter of law, injunctive relief is never available under the Consumer Fraud Act under the circumstances present here.

For the foregoing reasons, the judgment of the circuit court is affirmed insofar as it granted summary judgment to defendants on counts I and V and that portion of count IV which sought recovery based on tortuous interference with a business relationship. The judgment is reversed to the extent it granted summary judgment to defendants on count III and that portion of count IV based on the Consumer Fraud Act, and the cause is remanded for further proceedings consistent with this opinion.

Affirmed in part; reversed in part and remanded.

HOWERTON and WELCH, JJ., concur.