The APPRAISERS COALITION, Alan B. Blau, individually and d/b/a Alan Blau & Associates, W.S. Buckley, Buckley Appraisal Services, Inc., Vincent A. Solano, individually and d/b/a V.A. Solano & Associates, Plaintiffs,

v.

APPRAISAL INSTITUTE, an Illinois corporation, the American Institute of Real Estate Appraisers, an Illinois corporation, and Patricia Marshall, Bernard Fountain, Douglas Brown, C. David Matthews, Clifford E. Fisher, Jr., John R. Underwood, Jr., Bruce R. Willmette, Bonnie D. Roerig, David F. Peatfield, Donald L. Burke, Nancy M. Mueller, Gerald A. Teel, Norman E. Hall, Joe R. Price, Louie Reese III, and Ritch Le Grand, Defendants.

No. 93 C 913.

United States District Court, N.D. Illinois, E.D.

Feb. 15, 1994.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

This is an action arising out of alleged illegal competition in the non-residential real estate appraisal market. Plaintiffs filed suit on February 11, 1993, and filed a First Amended Complaint on March 3, 1993, before any response to the original complaint had been filed. The Defendants moved to dismiss that First Amended Complaint. On August 18, 1993, the Court issued a Memorandum Opinion and Order granting that motion. *Appraisers Coalition v. Appraisal Inst.*, No. 93–C–913, 1993 WL 326671 (N.D.Ill. Aug. 18, 1993). With the permission of the Court, Plaintiffs filed their Second Amended Complaint, seeking relief in eleven counts. Before the Court is Defendants' Motion to Dismiss the Second Amended Complaint. For the following reasons, the Motion is denied in part and granted in part, without prejudice to the Plaintiffs filing a final amended complaint, if appropriate, consistent with this Memorandum Opinion and Order.

## I. ALLEGATIONS OF FACT

Assuming as true the allegations in the Second Amended Complaint, and reasonable inferences therefrom, the Court summarizes the facts of the case as follows. The Plaintiffs are three individual non-residential real estate appraisers, Alan B. Blau, W.S. Buckley, and Vincent A. Solano, their respective businesses, Alan Blau & Associates, Buckley Appraisal Services, Inc., and V.A. Solano & Associates, and the Appraisers Coalition (the "Coalition"), a voluntary unincorporated association.[1] The individual Plaintiffs, through their businesses, and each member of the Coalition, is engaged in the profession of providing appraisals of non-residential real estate in the United States. Each of these appraisers is a member of an organization called the Society of Real Estate Appraisers, Inc. (the "Society").

The Society was founded in 1935 to establish, confer, and promote professional training, qualifications, and designations for real estate appraisers. Before January 1, 1991, the Society conferred one or more of three designations upon its individual members: (1) the SRPA, or Senior Real Property Appraiser, the Society's highest form of professional certification for appraisers of non-residential real estate; (2) the SRA, or Senior Residential Appraiser, which designated appraisers of residential real estate; and (3) the SREA, or Senior Real Estate Analyst, which pertains to financial analysis of income-producing real estate, but not necessarily appraisals. (Second Am.Compl. ¶¶ 16(a)-(c).) Each of the individual Plaintiffs and each member of the Coalition earned the Society's SRPA designation. (*Id.* ¶ 3.)

Until 1991, the Society, and its members, competed with Defendant American Institute of Real Estate Appraisers ("AIREA"), and its members. Like the Society, AIREA was organized in the 1930s to establish, confer, and promote professional training, qualifications, and designations for real estate appraisers. AIREA conferred two designations on its members: (1) the MAI, or "Member Appraisal Institute", which was conferred on AIREA members having top qualifications for appraising non-residential real estate; and (2) the RM, which was comparable to the Society's SRA. Thus, before 1991, the Society's SRPAs directly competed with

---

1. Although unincorporated, the Appraiser Coalition is entitled to sue in its own name under 735 ILCS 5/2–209.1 (Smith–Hurd 1993) which permits "any organization of 2 or more individuals formed for a common purpose, excluding a partnership or corporation" to sue and be sued.

AIREA's MAIs, and the SRAs directly competed with the RMs. Each of the individual Defendants is a holder of the MAI designation.

During the events leading to this lawsuit, a small percentage of Society members, having either an SRPA or SREA designation, also held an MAI designation, as was permitted by Society rules. Plaintiffs allege that "at some point prior to 1989" the "dual designation" MAI members of the Society managed to take control of that organization, despite the fact that such members made up less than four percent of the Society's voting members.

In 1989, AIREA representatives and Society representatives began discussing a "unification" of the two organizations. Under the initial "unification" proposal, AIREA's RM members would be given the option of automatically receiving the Society's better-known and more widely-held SRA designation; the Society's small number of SREAs, some of whom were not appraisers, would be given the option of automatically becoming MAIs. The SRPA designation was to be phased out; but, SRPAs, unlike SREAs, were not automatically permitted to become MAIs. Upon learning of the terms of the initial proposal, many SRPAs protested the elimination of their designation. These protests resulted in the inclusion, in the organizations' "Final Plan of Unification" (the "Plan"), of a provision stating that "all existing designations" would be "retained indefinitely" and would be "promoted until such time as the Board of Directors deems it appropriate to cease." By October 15, 1989, the Plan was set for submission to the respective voting members of the Society and AIREA. The Plan was to be either approved or disapproved at special membership meetings held on January 19, 1990.

Plaintiffs allege that the Plan was not approved at the special membership meetings. However, in June 1990, the Defendants caused AIREA, but not the Society, to vote on the Plan again. On January 1, 1991, the Defendants caused the Plan to take effect, without the approval of the Society's membership. (Second Am.Compl. ¶ 26.)

Upon implementation of the Plan, the Defendants took several actions that devalued the SRPA. With this implementation came the creation of the Defendant "Appraisal Institute", a parent corporation that now controls AIREA and the Society. Plaintiffs assert that the Appraisal Institute's name promotes public awareness of MAIs at the cost of public awareness of the SRPA designation, creating the appearance that MAIs are superior to SRPAs. Plaintiffs claim that they were further discriminated against by the Defendants' creation of the General Appraisal Board (the "GAB"). The GAB became the Appraisal Institute's arm for conferring the MAI designation, for controlling the ability of SRPAs to attain that designation, and for promoting the SRPA designation. Plaintiffs claim that SRPAs were locked out of any voice in these matters when the Defendants filled 11 of the 12 GAB positions with MAI holders, and prohibited the single SRPA member from voting on any matter affecting the qualifications for MAI status or the ability of SRPAs to become MAIs, and by restricting the Appraisal Institute's directors' ability to alter GAB policies.

Plaintiffs assert that Defendants "established a set of arbitrary, onerous, and subjective criteria" for those SRPAs seeking to become MAIs, even though some of the previous requirements for becoming an MAI were less stringent than those necessary to become a SRPA. (Compl. ¶ 29.) [2]

2. The Second Amended Complaint states the following with respect to the alleged arbitrary, onerous, and subjective criteria:
 (a) Defendants instituted a requirement that any SRPA wishing to become a MAI must take and pass a day-long Comprehensive Examination, even though as many as 700 current MAIs have never taken that examination;
 (b) Defendants provided in the Plan, and have rigidly enforced, a requirement that SRPAs wishing to become MAIs must demonstrate an additional year of "experience" beyond that which was required to earn the SRPA designation, even though the SRPA designation itself required more non-residential appraisal experience than was required to become a MAI; (c) Defendants instituted a requirement that SRPAs wishing to become MAIs must pass a "character and fitness review" at the hands of their MAI competitors, even though prior to the "unification" SRPAs demonstrably were required to adhere to a stricter standard of

Defendants failed to promote, and denigrated, the SRPA designation, despite their pre-unification promises to the contrary, by producing and disseminating materials, including advertisements, that tacitly disparaged SRPAs and that falsely implied that the SRPA designation was irrelevant, non-existent, inferior, or non-professional. (Compl. ¶¶ 30, 31.)

Plaintiffs claim that as a result of this discrimination: "the individual and business entity plaintiffs have been severely, if not irreparably, damaged in their business and property." (Compl. ¶ 33.) Plaintiffs complain that their SRPA designations have "become valueless at best" and, at worst, carry "a negative connotation in comparison with MAIs." (Id.)

Plaintiffs seek both legal and equitable remedies in their eleven count Second Amended Complaint. In Counts I–VI, Plaintiffs allege violations of federal law. Counts I, II, and III respectively assert claims for monopolization, attempted monopolization, and conspiracy to monopolize in violation of section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2 (1988). In Count IV, Plaintiffs allege that the Defendants agreed to a *per se* illegal restraint of trade in violation of section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (1988). Count V charges a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18 (1988). In Count VI, Plaintiffs claim that the Defendants violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1988).

Counts VII–XI are pendent state law claims. In Count VII, Plaintiff Solano claims that the Defendants violated the Illinois Antitrust Act, 740 ILCS 10/1 to 10/11 (Smith–Hurd 1993). In Count VIII, Plaintiff Solano seeks relief for violations of the Illinois Con-

sumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 to 505/12 (Smith–Hurd 1993). In Count IX, Plaintiffs Blau, Solano, Buckley, and Buckley Appraisal Services, Inc. claim that they were defamed and commercial disparaged. In Count X, Plaintiffs Blau, Solano, and Buckley plead tortious interference with their property rights. In Count XI, Plaintiffs Blau, Solano, and Buckley claim a common law breach of fiduciary duty.

## II. ANALYSIS

### A. Associational Standing

■ Defendants challenge the Coalition's standing to sue. The Second Amended Complaint names the Coalition as a Plaintiff in the five federal antitrust counts (I–V) and the Lanham Act false advertising count (VI). Since the Plaintiffs have not specifically alleged the capacity in which they contend the Coalition may sue, and since Plaintiffs have failed to allege any injury to the association itself,[3] the Court concludes that the Coalition must be seeking associational standings as a representative of its members. (See Defs.' Mem. in Supp. of Mot. to Dismiss Second Am.Compl. at 4.) The Plaintiffs do not dispute this conclusion. (See generally Pls.' Mem. in Resp. to Mot. to Dismiss Second Am.Compl.)

While associations are generally denied standing to sue for damages under the antitrust laws, the federal courts have permitted associations to maintain actions seeking injunctive relief on behalf of, and as the representative of, its members. See Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (holding that an association may have standing to sue as a represen-

---

ethics than MAIs (for example, the Society stripped a number of former SRPA/MAIs of their SRPA status on ethical grounds, though those same persons continue to retain their MAI status); and
(d) Defendants so arranged matters that SRPAs who nevertheless attempted to become MAIs were subject to subjective and arbitrary "reviews" and judgments by MAI panels whose members included direct competitors of the SRPA applicants.
(Second Am.Compl. ¶¶ 29(a)–(d).)

**3.** Such is a necessary allegation to substantiate an association's direct claim. *See Southwest Suburban Bd. of Realtors v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1379–80 (7th Cir.1987) (indicating that claim of injury to association itself is necessary to confer standing for a direct federal antitrust claim); *Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods*, 799 F.2d 6, 10 (1st Cir.1986) (indicating that claim of injury to association itself is necessary to confer standing for a direct Lanham Act claim).

tative of its members); *Southwest Suburban Bd. of Realtors v. Beverly Area Planning Ass'n,* 830 F.2d 1374, 1380 & n. 3 (7th Cir. 1987) (listing cases). Whether, and in what circumstances, it is permissible for an association to sue under the federal antitrust laws or under the Lanham Act is governed by the three part test established by the Supreme Court in *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). *See Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584 (7th Cir.1993) (applying *Hunt* to an association's antitrust claims); *Southwest Suburban Bd. of Realtors v. Beverly Area Planning Ass'n,* 830 F.2d 1374, 1380–81 (7th Cir.1987) (same); *Camel Hair & Cashmere Inst. of Am. v. Associated Dry Goods,* 799 F.2d 6, 10 (1st Cir.1986) (applying *Hunt* to an association's Lanham Act claims). Under *Hunt,* an association has standing to bring suit on behalf of its members when: (1) the members would otherwise have standing to sue for themselves; (2) the interests the association seeks to protect are "germane to the organization's purpose"; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441.

The Supreme Court reaffirmed the doctrine of associational standing in *UAW v. Brock,* 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986). In so doing, the Supreme Court also explained the basis for the doctrine. In *Brock,* the UAW and several of its members brought suit against the Secretary of Labor to challenge his interpretation of the eligibility provisions of the Trade Act of 1974, which provided benefits to workers laid off because of competition from imports. Among the Secretary's challenges to the suit was his contention that the UAW lacked standing to sue in federal court on behalf of its affected members. The district court found for the plaintiffs on the merits and the Court of Appeals for the District of Columbia reversed, without reaching the merits, holding that the UAW lacked standing to represent its members.

The Supreme Court reversed the Court of Appeals, applying the *Hunt* test. It then addressed the Secretary's contention that "absent a showing of particularized need", members of associations should be required to litigate common questions of fact or law against a common defendant only through the class action provisions of Fed.R.Civ.P. 23. In rejecting the Secretary's argument, the Supreme Court explained that the doctrine of associational standing had special features that made it "advantageous both to the individuals represented and to the judicial system as a whole." *Brock,* 477 U.S. at 289, 106 S.Ct. at 2532. In contrast with the class action vehicle, in which plaintiffs might have little in common other than their claims, an association suing on behalf of its members could draw upon a "pre-existing reservoir of expertise and capital." *Id.* This pooling of resources provides economies to both plaintiffs and courts. The Court concluded by noting:

> [T]he doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others. "The only practical judicial policy when people pool their capital, their interests, or their activities under a name and form that will identify collective interests, often is to permit the association or corporation in a single case to vindicate the interests of all." ... The very forces that cause individuals to band together in an association will thus provide some guarantee that the association will work to promote their interests.

*Brock,* 477 U.S. at 290, 106 S.Ct. at 2533 (quoting *Joint Anti–Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 187, 71 S.Ct. 624, 656, 95 L.Ed. 817 (1951) (Jackson, J., concurring)).

Here, Defendants argue that the Coalition should not be permitted to avail itself of the *Hunt* and *Brock* cases for three reasons. First, Defendants contend that the individual Plaintiffs have a conflict with the Coalition. Defendants also argue that the Plaintiffs have failed to satisfy both the second and third parts of the *Hunt* test. The Court rejects each of these arguments.

As Defendants point out in their Memorandum in Support of Motion to Dismiss Second

Amended Complaint, the conflict of interest argument they make "does not fit neatly within the three part test." (Mem. in Supp. at 6.) Federal courts have addressed similar arguments under both the second and three elements of the *Hunt* test; and at least one Court of Appeals has noted that such an argument might be construed as a proposed fourth element to that test. *See, e.g., Associated Gen. Contractors of California, Inc. v. Coalition for Economic Equity,* 950 F.2d 1401 (9th Cir.1991) (analyzing a conflict of interest argument under the third element of the *Hunt* test), *cert. denied,* —— U.S. ——, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992); *Southwest Suburban Bd. of Realtors v. Beverly Area Planning Ass'n,* 830 F.2d 1374, 1380–81 (7th Cir.1987) (analyzing a conflict of interest argument under the second element of the *Hunt* test); *National Maritime Union of Am. v. Commander, Military Sealift Command,* 824 F.2d 1228, 1232 (D.C.Cir.1987) (stating that a conflict of interest argument might be seen either as an attempt to add a fourth factor to the *Hunt* test or as a part of the third factor). Given that Defendants here have challenged the Coalition's ability to satisfy both the second and third elements of *Hunt,* the Court addresses the conflict issue first and then, when discussing the other arguments, will address any implications that issue might have on those arguments.

Defendants' contend that the interests of the individual Plaintiffs conflict with those of the appraisers represented by the Coalition. The individuals seek millions of dollars in damages. The Coalition seeks only injunctive relief. Because the individuals are officers and members of the Coalition, but seek damages in addition to equitable relief, they have created, so the argument goes, a litigation strategy conflict between themselves and the Coalition and, by implication, within the Coalition. In the opinion of the Court, this argument is insufficient to defeat associational standing.

The Seventh Circuit Court of Appeals clarified its position with respect to standing for associations having purported internal conflicts of interest in *Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584 (7th Cir.1993). In instructing a district court considering the issue of associational standing on remand, the Seventh Circuit stated that the court's analysis must begin with a review of the benefits of associational standing expressed in *Brock. Id.* at 607. These benefits must be weighed against any deficiencies an association might have, including actual and potential conflicts. In addressing apparent conflicts, district courts should determine if "other approaches less drastic than denying group standing" will protect the interests of those "whose position is not represented" by the association, "while affording the group and the judicial system as a whole the efficiencies that *Brock* has identified in associational standing." *Id.* at 607.

Given this charge from the Court of Appeals, it is the opinion of the Court that the efficiencies created by the Coalition in this case outweigh any conflicts created by its participation in this lawsuit. The Defendants protest that the Coalition does not really afford any of the efficiencies contemplated by *Brock* because it was organized solely as a means of financing this lawsuit. The Court disagrees, even accepting the Defendants' categorization of the Coalition.

The injunctive relief sought by the Coalition, if justified, would likely benefit any appraiser having an SRPA designation. While Plaintiffs have not stated how many members of the association there are, according to the Second Amended Complaint, there were 2,243 holders of the SRPA designation prior to implementation of the Plan. (Compl. ¶ 33.) After the implementation of the Plan, that number fell to approximately 900. *(Id.)* If the Coalition and the individual Plaintiffs succeed in their attempt to enjoin alleged anticompetitive conduct, at least these 900 individuals would benefit. The fact that the Coalition may have been formed as a vehicle to assemble financial resources does not run contrary to the *Brock* decision. In fact, as quoted above, the opinion specifically refers to the benefits afforded the public and the individuals making up the association by permitting the pooling of such resources. In addition, even if formed for purposes related to this litigation, the Coalition is still a pool of similarly situated individuals with similar interests. If Plaintiffs have valid claims, the

Court perceives no wrong in permitting them to rely on whatever resources, capital or intellectual, the Coalition may provide.

Contrasted with the benefits of the associational vehicle is Defendants' assertion that the Coalition's participation in this lawsuit is contrary to the interests of other appraisers potentially having claims in this lawsuit. The crux of this argument is that the individual defendants will have incentives to settle for cash in lieu of the injunctive relief sought by the Coalition. In the opinion of the Court, the purported "conflict" between the individual Plaintiffs and other members of the Coalition is only speculative at this point. Furthermore, the Court is not convinced that any such speculative conflict would be diminished by the absence of the Coalition. First, there is no indication of any immediate conflict or dissent within the Coalition. Second, the individual Plaintiffs, as officers and organizers of the Coalition, owe fiduciary duties to the other members of the organization. There is no indication that the Coalition's participation in this lawsuit will compromise those duties. Third, even if the Coalition were not a party to this lawsuit, the individual Plaintiffs, who also seek injunctive relief, might favor a cash settlement over injunctive relief. And, depending on the circumstances, such an agreement might be binding on other individuals, whether or not such individuals were parties to this lawsuit. Furthermore, should this case proceed to trial and the Plaintiffs lose, the doctrine of defensive collateral estoppel might bind future litigants regardless of whether the Coalition participates or not. Fourth, should any future litigant demonstrate that he or she was not adequately represented in this lawsuit, that individual would not be precluded from bringing suit. Given these factors, the Court is unwilling to deny the Coalition standing to file suit.

The Court's conclusion is supported by *Retired Chicago Police Ass'n.* In that case, the Seventh Circuit summarized the "major contributions" on this issue by other circuits. The Court of Appeals discussed two cases,

*Maryland Highways Contractors Ass'n v. Maryland,* 933 F.2d 1246 (4th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 373, 116 L.Ed.2d 325 (1991), and *Southwest Suburban Bd. of Realtors v. Beverly Area Planning Ass'n,* 830 F.2d 1374 (7th Cir.1987), in which associational standing had been denied. The basis for that conclusion, in both cases, was the existence of a "profound" conflict of interest. In the *Maryland Highways Contractors Ass'n* case the association's lawsuit worked to the "direct detriment" of the minority members of that association. The association in that case brought suit without observing its own by-laws. In *Southwest Suburban Bd. of Realtors,* members of the association were actual defendants in the case, a clearly unworkable conflict. As indicated in *Retired Chicago Police Ass'n,* the "profound" conflicts in those cases were inconsistent with *Brock.* No such profound conflict or inconsistency with *Brock* exists here.

Defendants protest that Plaintiffs failed to satisfy the second element of the *Hunt* test by failing to plead the Coalition's purpose. The second element of *Hunt* requires that the association in question seek to protect interests that are "germane to the organization's purpose." *Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441. This "germaneness" requirement formed one basis for the Seventh Circuit's decision in *Southwest Suburban Bd. of Realtors v. Beverly Area Planning Ass'n,* 830 F.2d 1374 (7th Cir.1987).[4] However, as indicated in *Retired Chicago Police Ass'n,* this "germaneness" requirement has teeth only when a conflict of interests exists. 7 F.3d at 607. Otherwise, the germaneness test requires only that "an organization's litigation goals be pertinent to its special expertise and the grounds that bring its membership together." *Id.* (quoting *Humane Soc'y of the United States v. Hodel,* 840 F.2d 45, 56 (D.C.Cir.1988)). Given that no "profound" conflict here exists, and given that the Coalition's membership came together to help prosecute this case, the germaneness test is satisfied. The Court will not deny the Coali-

---

**4.** The Court also questioned whether the plaintiff association could satisfy the third element of the *Hunt* test. *See Southwest Suburban Bd. of Real-* *tors v. Beverly Area Planning Ass'n,* 830 F.2d at 1381.

tion standing for a failure to plead its purpose.

Finally, Defendants contend that the Coalition should be denied standing for failure to satisfy the third element of *Hunt*, which states that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Defendants assert that, given the Second Amended Complaint's allegations, it will be necessary for several members of the Coalition to testify and further participate in the lawsuit. This position is not disputed. However, the third element in *Hunt* does not require a dismissal on that basis. The decision in *Retired Chicago Police Ass'n* makes clear that the *Hunt* test does not mean that dismissal is required when the participation of *any* association member is necessary. Rather, dismissal is only required when the lawsuit would require the participation of *each* member of the association. 7 F.3d at 601–02. The third element of *Hunt* is satisfied, despite the participation of one or many members of an association, when the cause of action and relief sought does not require "individualized proof" for the litigation of the case.

The difficult issue here presented is whether Plaintiffs claims require the "individualized proof" that would defeat Associational standing. As noted in dicta in both *Retired Chicago Police Ass'n*, 7 F.3d at 602 n. 25, and *Southwest Suburban Bd. of Realtors v. Beverly Area Planning Ass'n*, 830 F.2d at 1380–81, the proof of antitrust injury necessary to federal antitrust claims may require such "individualized proof." That kind of proof is necessary in circumstances where complex factual issues exist that require evidence of actions taken against individual defendants. *See Retired Chicago Police Ass'n*, 7 F.3d at 602 n. 25; *Southwest Suburban Bd. of Realtors v. Beverly Area Planning Ass'n*, 830 F.2d at 1380–81. However, as analysis of the "antitrust injury" requirement indicates, not all antitrust cases necessarily require inquiry into "complex factual issues" to resolve the question of antitrust injury. In particular, where an antitrust claim attacks a policy or practice that is equally applicable and detrimental to all members of an association, such

individualized proof is not necessary. *See National Office Mach. Dealers Ass'n v. Monroe, the Calculator Co.*, 484 F.Supp. 1306, 1307 (N.D.Ill.1980).

In *Cargill v. Monfort of Colorado*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986), the Supreme Court held that antitrust plaintiffs seeking injunctive relief pursuant to section 16 of the Clayton Act must demonstrate the threat of an "antitrust injury." An antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). This requirement is intended to serve two functions. First, as explained by professors Areeda and Hovenkamp:

It forces the parties and the court to reason closely about the nature of the antitrust violation alleged in order to test whether the injury and damages claimed by the plaintiff match the rationale for finding any violation in the first place.

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 334.2a (Supp.1992). Second, the requirement makes clear that "injuries resulting from competition will not support either damage or equity actions by private parties under the antitrust laws." Areeda & Hovenkamp, *supra*.

In some circumstances, determining whether the plaintiffs' alleged injury was an "antitrust injury" requires factual analysis of the injuries suffered by individual, or particular, members of the plaintiff association. Here, in contrast, the antitrust injuries complained of are based on the Defendants' alleged discriminatory policies and practices that purportedly devalued the SRPA designation. In the opinion of the Court, the factual proof of these policies and their anticompetitive effects does not require the complex individualized proof contemplated in *Southwest Suburban Bd. of Realtors*. While this case potentially requires complex legal analysis and a complex factual inquiry into the nature of the markets involved, these analyses do not depend on the evidence of any particular member of the Coalition. As individualized proof is not necessary to dem-

onstrate an antitrust injury here, the Court rejects Defendants' argument on this issue.

Accordingly, with respect to the issue of associational standing, Defendants' Motion to Dismiss is denied.

### B. Federal Antitrust Claims

#### 1. Sherman Act Section 2

In Counts I, II, and III respectively, Plaintiffs claim that the Defendants' conduct constituted illegal monopolization, illegal attempted monopolization, and a conspiracy to illegally monopolize.

#### a. Actual and Attempted Monopolization

■ In order to prove monopolization, a plaintiff must prove that a given defendant has (1) possession of monopoly power in the relevant market, and (2) acquired and maintained that power apart from permissible competitive means such as growth, development of a superior product, business acumen or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). To prove attempted monopolization, a plaintiff must show: (1) that the defendant has engaged in predatory or anticompetitive conduct, with (2) a specific intent to monopolize, and (3) a dangerous probability of achieving monopoly power. *Spectrum Sports v. McQuillan*, — U.S. —, — – —, 113 S.Ct. 884, 890–91, 122 L.Ed.2d 247 (1993).

■ Both monopolization and attempted monopolization thus require the acquisition or probable acquisition of monopoly power. In an attempt to satisfy this requirement, Plaintiffs allege that the MAIs, collectively and as a result of the institutional Defendants' conduct, maintain "substantial market power." (Compl. Count I ¶ 6 at 19.) In the opinion of the Court, this, and the other allegations in the Second Amended Complaint are sufficient to state claims for monopolization and attempted monopolization against the Appraisal Institute and AIREA (collectively, the "Institutional Defendants"),

but not against any of the individual Defendants.

Defendants argue that neither of the Institutional Defendants can be said to monopolize or attempt to monopolize the market for non-residential real estate appraisal services because neither directly competes in that market. *See White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 104–05 (4th Cir. 1987); *see also Ball Memorial Hosp. v. Mutual Hosp. Ins.*, 603 F.Supp. 1077 (S.D.Ind. 1985), *aff'd*, 784 F.2d 1325 (7th Cir.), *reh'g denied*, 788 F.2d 1223 (7th Cir.1986). Defendants' position rests on the assumption that the only market applicable to the Defendant institutions is the market for establishing, conferring, and promoting professional training, qualifications, and designations for real estate appraisers. This argument has only infrequently been addressed in the case law, *see Carleton v. Vermont Dairy Herd Improvement Ass'n*, 782 F.Supp. 926, 934–35 (D.Vt.1991), and was then questionably analyzed under a "monopoly leveraging" theory more appropriate for tying cases. In the opinion of the Court, however, several Supreme Court cases, although they do not discuss the issue, are sufficient precedent on which to permit the Plaintiffs to proceed. *See American Soc'y of Mechanical Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) (affirming the imposition of section 2 liability on an association that did not compete directly in its membership's market); *Silver v. New York Stock Exch.*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963) (same); *Associated Press v. U.S.*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) (same); *see also McDonnell v. Michigan Chapter No. 10, Am. Inst. of Real Estate Appraisers*, 587 F.2d 7 (6th Cir.1978) (indicating that group boycott by real estate association, also a Defendant in this case, may support monopolization claim). Accordingly, with respect to the institutional Defendants on Counts I, and II, Defendants' Motion to Dismiss is denied.[5]

In contrast, Plaintiffs have failed to state a monopolization or attempted monopolization

---

5. With respect to Counts I and II, the parties make no distinction between the two institutional Defendants. Neither, then, does the Court. Plaintiffs should be cautioned, however, that fu-

ture analysis will require such a distinction. The corporate form should be considered in all future proof.

claim against the individual Defendants. Plaintiffs make no allegation with respect to the market power of any individual or the individual Defendants collectively. Accordingly, with respect to the individual Defendants, on Counts I, and II, Defendants' Motion to Dismiss is granted.[6]

### b. Conspiracy to Monopolize

■ In Count III, Plaintiffs allege that the Defendants conspired to monopolize the market for non-residential real estate appraisal services. To prove a conspiracy to monopolize, a plaintiff must prove: (1) the existence of a combination or conspiracy, (2) overt acts in furtherance of the conspiracy, (3) an effect upon a substantial amount of interstate commerce, and (4) the existence of specific intent to monopolize. Unlike the proof required for monopolization or attempted monopolization, the proof required to demonstrate a conspiracy to monopolize does not require a proof of market power in a relevant market. *Perington Wholesale v. Burger King Corp.*, 631 F.2d 1369, 1376–77 (10th Cir.1979); *see also United States v. National City Lines*, 186 F.2d 562 (7th Cir.), *cert. denied*, 341 U.S. 916, 71 S.Ct. 735, 95 L.Ed. 1351 (1951).[7] Under this more permissive section 2 theory, individuals who are

incapable themselves of monopolizing a market, may be found liable under section 2 for intentionally joining others to do so.[8]

■ Defendants argue that *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), bars Plaintiffs' claim. In *Copperweld*, the Supreme Court held that an agreement between a parent corporation and its wholly owned subsidiary cannot be concerted action for purposes of section 1 of the Sherman Act. The Court also held that an agreement between officers or employees of the same firms does not constitute a section 1 conspiracy. The *Copperweld* reasoning also applies to section 2 claims. *Pudlo v. Adamski*, 789 F.Supp. 247, 252 (N.D.Ill.1992), *aff'd*, 2 F.3d 1153 (7th Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 879, — L.Ed.2d — (1994).

■ Despite the clear statement of the law in *Copperweld*, there is an exception to that doctrine. A subsidiary, officer or employee of a corporation may be said to have conspired with a corporation when the subsidiary or individual has an "independent interest" in participating in the conspiracy. *See* 7 Phillip E. Areeda, *Antitrust Law* ¶¶ 1470–1474 (1986). Although the "independent in-

---

**6.** The Plaintiffs do not specifically allege any vicarious liability upon which the Court might include the individual Defendants in Counts I and II. It may be that the individual Defendants could be included in Counts I and II due to the Court's finding that each might be held liable under the conspiracy to monopolize alleged in Count III and discussed *infra*. If the individuals are found to have conspired to monopolize, under Count III, they may be liable for the acts of their coconspirators. *See SEC v. Kimmes*, 799 F.Supp. 852 (N.D.Ill.1992), *aff'd*, 997 F.2d 287 (7th Cir.1993). This coconspirator theory of liability was not addressed by the parties in their memoranda. While there has been some question regarding this theory's applicability in antitrust cases, *see Zenith Radio Corp. v. Matsushita Elec. Indus.*, 513 F.Supp. 1100, 1176–78 (E.D.Pa. 1981) (discussing potential applicability of *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), to civil case based on Robison–Patman Act and Clayton Act claims), *aff'd in part, rev'd in part*, 723 F.2d 238 (3d Cir.1983), *rev'd*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Court sees no reason why it should not apply. *See Sidney Morris & Co. v. National Ass'n of Stationers*, 40 F.2d 620 (7th Cir.1930) (applying vicarious coconspirator liability to old precursor to Robinson–Patman

Act). This issue might be raised by Defendants should Plaintiffs include a civil *Pinkerton* theory of liability in their final amended complaint.

A second theory of liability, less commonly used in antitrust cases, that might be raised is an aiding and abetting theory. This theory is sometimes used in attempts to include labor unions as antitrust defendants. *See Hunt v. Crumboch*, 325 U.S. 821, 65 S.Ct. 1545, 89 L.Ed. 1954 (1945). Like the coconspirator theory, this theory was not alleged by Plaintiffs or raised in argument. Its applicability to this case, like that of the coconspirator theory, remains to be resolved.

**7.** The Court notes that *Unites States v. National City Lines* has been criticized, *see Besser Publishing Co. v. Pioneer Press, Inc.*, 571 F.Supp. 640, 641 (N.D.Ill.1983); *Tire Sales Corp. v. Cities Serv. Oil Co.*, 410 F.Supp. 1222, 1232 (N.D.Ill.1976), *rev'd*, 637 F.2d 467 (7th Cir.1980), *cert. denied*, 451 U.S. 920, 101 S.Ct. 1999, 68 L.Ed.2d 312 (1981), but it remains the law in this Circuit.

**8.** Since it was not addressed by the parties, the Court leaves open the issue of whether, in proving a claim for conspiracy under section 2, a plaintiff must prove that the conspirators collectively must be capable of achieving a monopoly or monopoly power.

terest" exception has been limited, *see, e.g., Nurse Midwifery Assocs. v. Hibbett,* 918 F.2d 605, 612–15 (6th Cir.1990) (holding that medical staffs could not conspire with hospitals even if members of the staffs have "independent personal stake" in the alleged conspiracy), *modified,* 927 F.2d 904 (6th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 406, 116 L.Ed.2d 355 (1991), it must be considered to apply when an entity's agents or employees are direct competitors. *See Poller v. Columbia Broadcasting Sys.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (holding that CBS could conspire with one of its affiliates to eliminate another affiliate from competition); *Spence v. Southeastern Alaska Pilots' Ass'n,* 789 F.Supp. 1014 (D.Alaska 1992) (holding that an association and its members could conspire when the members competed against each other); *United States v. Metro MLS, Inc.,* No. 210–73–N, 1973 WL 918 (E.D.Va.1973) (holding that a real estate listing corporation could conspire with its members when each member of the corporation maintained a related business entity separate from the corporation). Unlike in *Copperweld,* each member of the Defendant trade associations is a competitor capable of conspiring with the other members.

Turning to the substance of the allegations against the Defendants, the Court concludes that Plaintiffs have stated a claim against every Defendant save AIREA. AIREA has no independent interest apart from the Appraisal Institute and must therefore be dismissed under *Copperweld.* With respect to the individual Defendants, Plaintiffs allegations are scant.[9] The Court concludes, however, given reasonable bounds of inference from the facts alleged, that these allegations are sufficient to notify each of the individual Defendants of his or her purported role in the alleged conspiracy. The Second Amend-

9. The Plaintiffs' allegations against the individual Defendants, with the exception of Joe R. Price who is specifically mentioned in one other paragraph, are completely quoted as follows:

13. All of the individual defendants are holders of the MAI designation. They are, and have been at all material times, engaged in direct competition with plaintiffs, in interstate commerce in the United States, for non-residential real estate appraisal business. All of the individual defendants are or were officers or officials of the Society, AIREA, and/or the Appraisal Institute. Acting for their own individual benefits and purposes, with intent to benefit themselves individually and/or through their various businesses, each of them participated with defendants AIREA and Appraisal Institute in implementing and furthering the MAIs' takeover of the Society, the elimination of competition from SRPAs, and the other wrongful conduct described in this Complaint. More particularly:

(a) At all material times, each of defendants **LOUIE REESE III,** a resident of Alabama, and **RITCH LeGRAND,** a resident of Iowa, held the MAI designation. However, each also held a Society-conferred designation, and in that capacity Reese and LeGrand became presidents of the Society in 1989 and 1990 respectively and used their offices to urge the members of the Society to accept and vote for the AIREA "unification" scheme by which the MAIs effected the takeover of the Society and the crippling of competition from the SRPAs.

(b) At all material times, each of defendants **PATRICIA MARSHALL** and **BERNARD FOUNTAIN,** residents of New York, and **DOUGLAS BROWN,** a resident of South Carolina, held the MAI designation. All of them

were and are members of the Appraisal Institute's Executive Committee (Marshall was also President of the Institute and AIREA's First Vice President), and exercise substantial influence and control over the Appraisal Institute's operations.

(c) In addition, defendant Fountain was a Society Vice–President in 1990 and is now a Director of the Society; and, though neither has ever earned nor held any designation conferred by the Society, defendant Marshall is currently the President of the Society and defendant Brown is currently the Treasurer of the Society.

(d) At all material times, each of the defendants **C. DAVID MATTHEWS, CLIFFORD E. FISHER, JR., JOHN R. UNDERWOOD, JR., BRUCE R. WILLMETTE, BONNIE D. ROERIG, DAVID F. PEATFIELD, DONALD L. BURKE, NANCY M. MUELLER, GERALD A. TEEL,** and **NORMAN E. HALL** has held the MAI designation. Each of those defendants is a member of, and together those defendants control and operate, the General Appraisal Board ("GAB") of the defendant Appraisal Institute. The GAB, which operates from the Institute's headquarters in Chicago, Illinois, controls the requirements for, and the conferring and promotion of, the MAI designation, and as a result of the MAIs' takeover of the Society also controls the promotion of the SRPA designation and the ability of SRPAs to become MAIs.

(d)[sic] At all material times, defendant **JOE R. PRICE** has held the MAI designation and has been the Regional Chairman of the Appraisal Institute's "Region X," which includes the entire State of Florida.
(Second Am.Compl. ¶ 13.)

ed Complaint also adequately notifies the Appraisal Institute of the allegations against it.

Defendants argue that under *Boerstler v. American Medical Ass'n,* 16 F.R.D. 437, 447 (N.D.Ill.1954), Plaintiffs have failed to properly plead the names of all persons involved in the alleged conspiracy and the years of their participation. As Defendants, point out, however, *Boerstler* did not require that the case be dismissed, only that the Defendants make a more definite statement.

Accordingly, with respect to Defendant AIREA, Defendants Motion to Dismiss is granted. With respect to the remaining Defendants, the Motion to Dismiss is denied.

### 2. Sherman Act Section 1

 Section 1 of the Sherman Act prohibits "every contract, combination . . . or conspiracy in restraint of trade." 15 U.S.C. § 1 (1988). Despite this broad language, however, only unreasonable restraints violate this section. *Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). A plaintiff may demonstrate that a particular restraint is unreasonable either by demonstrating that the restraint falls within a narrow set of *per se* unreasonable restraints, or by conducting a "rule of reason" analysis to show that the restraint's anticompetitive effects outweigh any "redeeming virtues." Here, in Count IV, Plaintiffs allege that the Defendants' conduct constitutes a *per se* illegal boycott, or "concerted refusal to deal." Although the Court previously indicated that *per se* analysis would apply to this case, the Court now believes that a rule of reason analysis is called for.

Boycotts are among those limited restraints that are considered *per se* illegal. *See, e.g., Klor's, Inc. v. Broadway–Hale Stores,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (holding that a concerted refusal to deal was *per se* illegal despite significant competition in the relevant market); *Fashion Originators' Guild of Am. v. FTC,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). Despite these conclusions, the Supreme Court's application of the *per se* rule to purported boycotts and concerted refusals to deal has been mixed. The Court has warned

against "over-zealous" application of the doctrine and has stated that the rule should be applied only when the challenged practice threatens the "proper operation of our predominantly free-market economy" or when the challenged practice "facially appears to be one that would always or almost always tend to restrict competition and decrease output." *Broadcast Music Inc. v. Columbia Broadcasting Sys.,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979).

In light of its increased concern over the applicability of the *per se* rule, the Supreme Court has "been slow to condemn rules adopted by professional associations." *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 458, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986). This reluctance has been expressed by the Seventh Circuit with respect to both professional and trade associations. *See Wilk v. American Medical Ass'n,* 895 F.2d 352, 359 (7th Cir.1990) (discussing professional associations), *cert. denied,* 496 U.S. 927, 110 S.Ct. 2621, 110 L.Ed.2d 642 *and cert. denied,* 498 U.S. 982, 111 S.Ct. 513, 112 L.Ed.2d 524 (1990); *Phil Tolkan Datsun v. Greater Milwaukee Datsun Dealers' Advertising Ass'n,* 672 F.2d 1280, 1285 (7th Cir. 1982) (discussing trade associations). Typically, professional and trade associations' rules of exclusion or restriction are evaluated under the rule of reason. *See, e.g., Vogel v. American Soc'y of Appraisers,* 744 F.2d 598, 603–04 (7th Cir.1984); *Koefoot v. American College of Surgeons,* 652 F.Supp. 882 (N.D.Ill.1986).

Plaintiffs argue that *Phil Tolkan Datsun* created an exception regarding this Circuit's treatment of association rules. They contend that in that decision, the Seventh Circuit implied that the *per se* rule for boycotts would apply to a trade association's membership requirements when membership in that trade association is necessary to compete effectively in the relevant market. *See Phil Tolkan Datsun,* 672 F.2d at 1285–86. While support for that assumption may be found in *Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945), and in *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), application of the proposed rule often re-

quires a court to beg the question of the reasonableness of the proposed restraint. Even then, in applying a *per se* analysis, Courts are often forced to take a "quick look" at the reasonableness of the challenged restraint.[10] Here, there likely will be factual disputes over the relative competitive statuses of MAIs and SRPAs and over the restrictiveness of the rules governing an SRPA's conversion to an MAI. Given this required analysis, the court concludes that at least a "quick look" is required. Therefore, rather than engage in any abbreviated analysis of the challenged restraint, the Court will proceed under the "rule of reason".

Accordingly, with respect to Count IV, Defendants' Motion to Dismiss is granted, without prejudice to Plaintiffs' amending this Count to plead a claim based on the "rule of reason."[11]

### 3. Clayton Act Section 7

In Count V of their Second Amended Complaint, Plaintiffs allege that Defendants violated Section 7 of the Clayton Act, 15 U.S.C. § 18 (1988), by merging AIREA with the Society through the vehicle of the Appraisal Institute. Section 7 prohibits one corporation from acquiring another corporation where the effect of the merger "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18 (1988).

Despite these allegations, Plaintiffs make no allegation regarding the market in which competition was lessened or monopolized. While either the market for non-residential real estate appraisal services or the market for establishing, conferring, and promoting professional training, qualifications, and designations for real estate appraisers, or both, might have been alleged, Plaintiffs do not state a claim without notifying the Defen-

dants of the market said to be monopolized. *See United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057 (1957) (indicating that identification of the relevant product and geographic markets is a "necessary predicate" to a section 7 claim). Accordingly, with respect to Count V, Defendants' Motion to Dismiss is granted.

### C. The Lanham Act

In Count VI, Plaintiffs claim that all of the Defendants violated section 43(a) of the Lanham Act. That section, in relevant part, states:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

. . . . .

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (1988).

To state a claim for false advertising under section 43(a), a plaintiff must allege that the defendants' advertisements were: (1) false and misleading; (2) actually or likely to deceive a substantial segment of their audience; (3) material in their effects on purchasing decisions; (4) touting goods or services in interstate commerce; and, (5) likely to injure the plaintiff. *See Cook, Perk-*

---

10. This approach includes a "quick look" at the reasonableness of the restraint. *See* 7 Phillip E. Areeda, *Antitrust Law* ¶¶ 1510c, 1511 (1986). The "quick look" is a means by which the *per se* rule and "rule of reason" have been collapsed. The "quick look" means that the Court will first consider the justifications for the challenged restraint. A persuasive justification for an apparent illegal restraint may require further analysis which effectively converts a *per se* approach into a rule of reason analysis.

11. In amending this Count, Plaintiffs are directed to be cautious about the inclusion of both institutional Defendants. As was indicated in the Court's discussion of Plaintiffs' section 2 claims, the Appraisal Institute and AIREA cannot conspire with one another under *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984).

*iss & Liehe, Inc. v. Northern California Collection Serv.,* 911 F.2d 242, 244 (9th Cir. 1990).

12. These allegations are quoted as follows:

30. Having effectively disenfranchised SRPAs and drastically impaired their ability to preserve competitive equality by obtaining the MAI designation, as described in ¶¶ 28 and 29 above, following the "unification" defendants have not only also failed to promote the SRPA designation (contrary to their pre-unification promises, see ¶ 25 above), but in fact have actively denigrated the SRPA designation relative to the MAI designation and thereby unfairly, deceptively, and *anti-competitively advantaged MAIs (including themselves) at the expense of SRPAs (including plaintiffs).* Among numerous examples are the following, all of which, whether produced and disseminated by the Appraisal Institute or by one of its Chapters, were and are under defendants' supervision and control:

(a) Within weeks of the "unification" effective date, an Appraisal Institute advertisement in Florida's most prominent real estate publication falsely stated that **"NOW THERE ARE ONLY *TWO* PROFESSIONAL DESIGNATIONS FOR APPRAISERS"**—which the advertisement identified as:

"**MAI** Member Appraisal Institute **SRA** Senior Residential Appraiser"—

and reinforced the falsehood by "warning" the consuming public that

*"Many call themselves appraisers but not all appraisers are professionals."*

This tacit disparagement of SRPAs carried the *imprimatur* of the official Appraisal Institute logo.

(b) Numerous Appraisal Institute advertisements in educational materials have made and continue to make no mention whatever of the SRPA designation. Instead, these advertisements feature two large logos (each over three times taller than the advertisement's largest type face) superimposed over the outline of the United States—the SRA logo and (as the "lead" logo) the logo of "MAI—American Institute of Real Estate Appraisers."

(c) Defendants have fostered a campaign of promotions and advertising designed to convey the false and misleading impression that the SRPA designation is at best irrelevant or non-existent, if not actually inferior and non-professional. In addition to the examples noted above, these have included advertisements, such as one in the January 30, 1991 BANKER AND TRADESMAN magazine, asking the buying public the question:

**"Who in the world could give you the fair and square value of an oval office?"**

The answer (under a picture of the White House) once again disparaged SRPAs:

**"A Real Estate Appraiser certified as MAI. A designation of such demanding requirements that only 3% of the appraisers in America have qualified. Experience. Knowledge. Ethics.**

In paragraphs 30 and 31 of the Second Amended Complaint, Plaintiffs describe the allegedly disparaging advertising.[12] Plain-

**Professionalism. Performance. These are the reasons courts, banks, developers, brokers, and government agencies for over fifty years have sought out and relied upon MAI appraisals. The next time you require a real estate appraiser, demand an MAI."**

(d) Numerous advertisements placed by individual Chapters of the Appraisal Institute treat SRPAs and the SRPA designation as nonexistent. The Chapters identify themselves, for example, as

"**APPRAISAL INSTITUTE—CLEVELAND CHAPTER Awarding the MAI and SRA Professional Designations.**"

(e) Continuing the theme of SRPA non-existence and/or professional inferiority, an · Appraisal Institute promotional piece put forth under defendants' supervision and control asserts—*falsely,* since SRPAs are also members of the Institute—that:

"**The Appraisal Institute members hold two of the oldest and most respected professional designations in the real estate appraisal industry, the MAI (general appraisers specializing in all types of properties) and SRA (specialists in appraisals of individual properties of 1–4 units).**"

(f) Even when defendants do not disparage SRPAs (and advantage MAIs) by omitting SRPAs outright, defendants' official publication descriptions denigrate SRPAs. Those publications state, for example, that MAIs *"are experienced,"* while SRPAs (if mentioned at all) merely "have experience;" that MAIs do "valuation *and evaluation,*" while SRPAs (if mentioned at all) merely do "valuation;" and that MAI is a *"professional* membership designation," while SRPA is merely a "membership designation."

31. Defendants' wrongful conduct described in ¶ 30 above has not abated with time, despite numerous complaints and entreaties from plaintiffs. At the instance of defendant JOE R. PRICE, plaintiffs believe, still another disparaging advertisement was placed in the January, 1993 edition of *Florida Trend,* the best known real estate business publication in Florida, falsely stating that as a result of a recent merger "MAI and SRA *are the surviving designations ...*" [Emphasis added]. Defendant Price, regional chairman for defendant Appraisal Institute's Region X, which includes Florida, is a competitor of, *inter alia,* plaintiffs Buckley and Buckley Appraisal Services, Inc. The address given in the advertisement is 1639 Forum Place, West Palm Beach, Florida, 33401, which on information and belief is the address of defendant Price's real estate appraisal business. On information and belief, defendant Price has also been instrumental in earlier disparaging advertising promulgated in Florida.

(Second Am.Compl. ¶¶ 30–31.)

tiffs contend that only two weeks after the implementation of the "unification" Plan, the Appraisal Institute placed an advertisement in Florida's "most prominent real estate publication" which falsely stated that: "Now there are only two professional designations for appraisers." Those two designations were identified as the MAI and the SRA. No mention was made of the SRPA. Plaintiffs also complain that the Appraisal Institute has made several other advertisements promoting the SRA and the MAI designations without promoting the SRPA designation.

In the only example in the Second Amended Complaint of allegedly false advertising by an individual Defendant, Plaintiffs complain that Defendant Price, a regional chairman for the Appraisal Institute, caused an advertisement to be placed in the January, 1993 edition of *Florida Trend.* The advertisement stated that as a result of a recent merger "MAI and SRA are the surviving designations ..."

■ Although the Defendants contend that the advertisements alleged are neutral with respect to the SRPA, and merely puff up the MAI, *see Castrol Inc. v. Pennzoil Co.,* 987 F.2d 939, 945–46 (3d Cir.1993); *Cook, Perkiss & Liehe, Inc. v. Northern California Collection Serv.,* 911 F.2d 242, 245 (9th Cir. 1990), the substantive allegations against Defendants Price and the Appraisal Institute are sufficient to withstand a motion to dismiss. To state a claim for a Lanham Act violation, a plaintiff need not allege that the defendant's representations make direct comparisons to the plaintiff's product or even specifically mention the plaintiff's product. *See Castrol Inc.,* 987 F.2d at 946. The representations alleged by Plaintiff might reasonably be understood to be misrepresentations. Plaintiffs have thus stated the substance of a claim.[13]

Defendants correctly point out, however, that Plaintiffs have stated claims only against the Appraisal Institute and Joe R. Price. No other Defendant is specifically connected to

any alleged misrepresentation. Given that Plaintiffs have not alleged or demonstrated the applicability of any theory of vicarious liability, they do not state a claim against the other Defendants.

Accordingly, with respect to Defendants Appraisal Institute and Joe R. Price, on Count VI, Defendants' Motion to Dismiss is denied. With respect to the other Defendants, the Motion is granted.

### D. *Pendent State Law Claims*

#### 1. *Illinois Antitrust Laws*

In Count VII, Plaintiff Solano alleges a violation of the Illinois Antitrust Act, 740 ILCS 10/1 to 10/11 (Smith–Hurd 1993), incorporating by reference parts of each of the first five counts. As the Court treats the state antitrust law as it would federal law, *see* 740 ILCS 10/11 (Smith–Hurd 1993) (indicating that Illinois state courts should be guided by the federal antitrust law where the wording of the state act is identical to a federal provision), the Court concludes as follows. To the extent federal antitrust counts, or parts thereof, have been dismissed, the corresponding parts of this count are also dismissed. To the extent the previous counts remain, this count remains.

Accordingly, with respect to Count VII, Defendants Motion to Dismiss is denied in part and granted in part, as indicated above.

#### 2. *Illinois Consumer Fraud and Deceptive Business Practices Act*

In Count VIII, Plaintiff Solano claims that the Defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 to 505/12 (Smith–Hurd 1993). That act purports to prohibit all unfair methods of competition, but has been restricted to deceptive practices. *Laughlin v. Evanston Hosp.,* 133 Ill.2d 374, 140 Ill.Dec. 861, 868, 550 N.E.2d·986, 993 (1990).

■ A violation of the Illinois Consumer Fraud and Deceptive Business Practices Act based on misrepresentation or fraud must be

---

**13.** Defendants also contend that Plaintiffs have made no allegations with respect to their goods or services which have been misrepresented. This concern is adequately addressed by the Sec-

ond Amended Complaint. In this Count, Plaintiffs seek damages for the misrepresentation of the quality of their appraisal services.

plead with the particularity of Rule 9(b) of the Federal Rules of Civil Procedure. *See Ramson v. Layne,* 668 F.Supp. 1162, 1170 (N.D.Ill.1987). To the extent that Plaintiffs claim any of the Defendants violated section 505/2, Rule 9(b) is satisfied only with respect to Defendants Appraisal Institute and Price, based on the misrepresentations said to satisfy the Lanham Act.

■ Plaintiffs seek to include the remaining Defendants within the scope of this count by alleging, without specificity, that the Defendants' "foregoing schemes" and "foregoing conduct", presumably meaning the previously alleged violations of the Sherman and Clayton Acts, constituted violations of section 505/2. Without addressing the question of whether these allegations afford sufficient notice, the Court concludes that Plaintiffs have failed to state a claim with respect to any of the remaining Defendants. According to the Supreme Court of Illinois, the act is "limited to conduct that defrauds or deceives consumers or others." *Laughlin v. Evanston Hosp.,* 140 Ill.Dec. at 868, 550 N.E.2d at 993; *see also Sullivan's Wholesale Drug Co. v. Frayl's Pharmacy, Inc.,* 214 Ill.App.3d 1073, 158 Ill.Dec. 185, 191, 573 N.E.2d 1370, 1376 (citing *Laughlin* ), *appeal denied,* 141 Ill.2d 561, 162 Ill.Dec. 510, 580 N.E.2d 136 (1991). Since Plaintiffs have failed to plead a theory of vicarious liability, they state a claim only against the Appraisal Institute and Price.

Accordingly, with respect to Defendants Appraisal Institute and Price, on Count VIII, Defendants' Motion to Dismiss is denied. With respect to the remaining Defendants, the Motion is granted.

### 3. Defamation and Commercial Disparagement

■ In Count IX, Plaintiffs Blau, Solano, Buckley, and Buckley Appraisal Services, claim that the Defendants defamed them. To state a claim for defamation, a plaintiff must show that a defendant or defendants made a false statement concerning him, that there was an improper publication to a third party with the defendant or defendants at fault, and that the statement's publication caused damage to the plaintiff. *Krasinski v. United Parcel Serv.,* 124 Ill.2d 483, 125 Ill.

Dec. 310, 313, 530 N.E.2d 468, 471 (1988). Here at issue is whether the Plaintiffs have properly stated that they were damaged by the Defendants' alleged statements.

■ Defamatory statements may be considered defamatory *per se* or *per quod.* Statements are defamatory *per se* when "the words used are so obviously and materially harmful to the plaintiff that injury to his reputation may be presumed." *Kolegas v. Heftel Broadcasting Corp.,* 154 Ill.2d 1, 180 Ill.Dec. 307, 312, 607 N.E.2d 201, 206 (1992). Statements are defamatory *per quod* if when their defamatory character is not apparent on their face, and extrinsic facts are required to explain their defamatory meaning. *Id.* If a plaintiff properly pleads *per se* defamation, he need not make any specific allegations with respect to his damages; damages are presumed. However, if a plaintiff must demonstrate *per quod* defamation to prevail, he must specifically plead his special damages in his complaint. Fed.R.Civ.P. 9(g).

Here, Plaintiffs make no specific allegations with respect to their damages; they only allege that Defendants' statements injured their business reputations. These allegations are insufficient to state special damages. *See Brown & Williamson Tobacco Corp. v. Jacobson,* 713 F.2d 262, 270 (7th Cir.1983). Plaintiffs must therefore must show *per se* defamation to proceed with their defamation claim.

Initially, the Court notes that Plaintiffs make the general allegation that the Appraisal Institute publishes and disseminates materials which assert that MAIs hold a "professional membership designation", while SRPAs do not. These allegations lack the specificity required to state a claim. *See Derson Group, Ltd. v. Right Management Consultants,* 683 F.Supp. 1224, 1229 (N.D.Ill. 1988).

Plaintiffs do point to one specific advertisement said to falsely impute their lack of professionalism. Plaintiffs claim that the Defendants falsely claimed in the challenged advertisement that MAIs and SRAs are the "only two professional designations for appraisers." That statement, coupled with the statement "Many call themselves appraisers

but not all appraisers are professional," contained in the same advertisement, is argued to be defamatory. Plaintiffs contend that the statements that "Now there are only two professional designations for appraisers" and that "[m]any call themselves appraisers but not all appraisers are professional," are *per se* defamatory because they impute lack of professionalism to SRPAs. A statement that imputes an "inability to perform or want of integrity in the discharge of duties of office or employment" is one of four categories of statements that are considered defamatory *per se* in Illinois. *Id.*

In the opinion of the Court, Defendants statements may be understood to impute a lack of professionalism to SRPAs, assuming, as Plaintiffs claim, SRPAs are professional appraisers. The alleged statement clearly limits professional appraisers to MAIs and SRAs. To a knowledgeable reader, this statement has the same effect as the statement: "SRPAs are not professional appraisers."

Defendants contend that the statements are subject to the "innocent construction" rule. The rule is stated as follows:

> [A] written or oral statement is to be considered in context, with the words and the implications therefrom given their natural and obvious meaning; if, as so construed, the statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff it cannot be actionable *per se.*

*Chapski v. Copley Press,* 92 Ill.2d 344, 65 Ill.Dec. 884, 888, 442 N.E.2d 195, 199 (1982). Taken in the context of the facts as set out in the Second Amended Complaint, the alleged statements cannot be given a reasonably innocent meaning. Assuming SRPAs were professional appraisers at the time the statement was published, the statements stating that only other kinds of appraisers were "professional" cannot be innocently construed. That argument is thus rejected.

Defendants also argue that the statements were not defamatory because they did not specifically refer to any of the Plaintiffs or to SRPAs in general and therefore were not "obviously and naturally hurtful" so as to be considered defamatory *per se.* Defendants do not provide the Court with authority that supports this position, however. The Court will therefore let this claim proceed against the Appraisal Institute.[14] No other Defendant is specifically alleged to have made the advertisement here found to be defamatory *per se.*

In addition to making its defamation allegations, Count IX is also predicated on the common law action of commercial disparagement. Although there is some dispute as to whether this type of action remains viable in Illinois, the Court, for the moment, accepts the reasoning of Judge Duff in *Richard Wolf Medical Instruments Corp. v. Dory,* 723 F.Supp. 37, 42 (N.D.Ill.1989). In *Dory,* Judge Duff held that commercial disparagement was still actionable in Illinois.[15]

■ To state an action for commercial disparagement, the plaintiff must show that the Defendant made false and demeaning statements regarding the quality of another's goods and services. *Zahran v. National Guardian Life Ins.,* No. 90–C–907, 1993 WL 116738 at *3 (N.D.Ill. April 14, 1993) (Grady, J.). In the opinion of the Court, Plaintiffs have stated a claim under this standard. The statement regarded as defamatory might also be reasonably construed to demean the quality of Plaintiffs appraisal services.

Accordingly, Defendants Motion to Dismiss Count IX is denied with respect to the Appraisal Institute. The Motion is granted with respect to the remaining Defendants.

#### 4. Usurpation of a Commercial Property Right

■ In Count X, Plaintiffs Blau, Solano, and Buckley claim that the Defendants unlawfully interfered with their right to pursue their business. This is an attempt to

---

**14.** Contrary authority may be presented to the Court on a Motion for Summary Judgment, if appropriate.

**15.** The validity of the *Wolf* decision and the relationship between the commercial disparagement theory and the defamation theory may be raised on a motion for summary judgment, if appropriate.

plead the common law tort of tortious interference. *See City of Rock Falls v. Chicago Title & Trust Co.*, 13 Ill.App.3d 359, 300 N.E.2d 331, 333 (1973). The elements of this tort are as follows: (1) the existence of a valid business expectancy; (2) knowledge of that expectancy by the interferer; (3) interference causing a termination of that expectancy; and (4) damages. *Id.*

Plaintiffs have alleged an expectancy in their SRPA designations. The Plaintiffs allegations with respect to purported anticompetitive activity are sufficient to permit this claim to proceed with respect to each of the Defendants, at least to a motion for summary judgment, if appropriate.

Accordingly, Defendants' Motion to Dismiss Count X is denied.

#### 5. Breach of Fiduciary Duty

In Count XI, Plaintiffs Blau, Solano, and Buckley claim that Defendants Marshall, Fountain, Brown, Reese and Le Grand breach fiduciary duties owed by virtue of their positions as officers of the Society.

 The Second Amended Complaint alleges that Defendants Marshall and Brown are current officers of the Society. It does not allege that Marshall and Brown were officers of the Society at the time of "unification." Any breach of fiduciary duty by either Marshall or Brown, based on either's status as an officer of the Society, must be predicated on post-unification conduct. The Second Amended Complaint fails to allege any such conduct by the Society. While these Defendants might have been involved in a conspiracy post unification, there is no indication, or permissible inference, that Marshall or Brown breached a fiduciary duty. Neither had any power relevant to the Second Amended Complaint. According to Plaintiffs' allegations, the Society lacked the power to affect the SRPA designation post-unification. Accordingly, with respect to Defendants Marshall and Brown, the motion to dismiss, on Count XI, is granted.

With respect to Defendants Fountain, Reese, and Le Grand, Plaintiffs' claims may proceed.

Accordingly, Defendants' Motion to dismiss is granted in part and denied in part, as indicated.

### III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is denied in part and granted in part. Plaintiffs are granted leave to file a final amended complaint within thirty days of the date of this Memorandum Opinion and Order.